In re NATIONAL AIRLINES, INC., Maternity Leave Practices and Flight Attendant Weight Program Litigation.

Barbara Ann GARDNER et al., Plaintiffs,

v.

NATIONAL AIRLINES, INC., Defendant.

Susan Gail LEONARD, Plaintiff,

v.

NATIONAL AIRLINES, INC., and Air Line Pilots Association International, Defendants.

MDL No. 218, No. 75–1968–Civ–NCR and No. 75–719–Civ–NCR.

United States District Court, S. D. Florida.

May 17, 1977.

---

See also D.C., 434 F.Supp. 266.

Donald B. Myers, Debevoise & Liberman, Robert B. Wallace, Surrey Karasik & Morse, Washington, D.C., Lawyers Committee for Civil Rights Under Law, Washington, D.C., for Barbara Ann Gardner, Sherry Knipple, and Marilyn White, plaintiffs.

Donald J. Parker, Gann, McIntosh, Flaherty & Parker, Chicago, Ill., and Gerald M. Walsh, Gerald M. Walsh and Associates, P.A., Fort Lauderdale, Fla., for Susan Gail Leonard, plaintiff.

Barry Davidson, and John Barkett, Steel Hector & Davis, Miami, Fla., for National Airlines, Inc.

Rosalind Kachman, Cohen, Weiss & Simon, New York City, and Manners & Amoon, P.A., Miami, Fla., for Air Line Pilots Assoc. International.

Asher W. Schwartz, O'Donnell & Schwartz, New York City, and Alan Greenfield, Miami, Fla., for TWU.

## MEMORANDUM OPINION

ROETTGER, District Judge.

A series of lawsuits alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.*, were instituted by female ground employees and flight cabin attendants against National Airlines, Inc. and its flight attendants' collective bargaining representative. They were consolidated in this court by order of the Judicial Panel on Multidistrict Litigation entered on August 29, 1975, pursuant to 28 U.S.C. § 1407. *In re National Airlines, Inc. Maternity Leave Practices and Weight Program Litigation,* 399 F.Supp. 1405 (Jud.Pan.Mult.Lit.1975).

Inasmuch as the mandatory maternity leave policies of all the trunk airlines except Northwest are the same, these issues could have been decided before one United States District Judge. The court has discovered that similar lawsuits are pending against Eastern Airlines, Western Airlines and Pan American World Airways. Perhaps this court, or others, or the parties, have been

remiss in not bringing these matters to the attention of the Judicial Panel on Multidistrict Litigation. However, at this stage of the instant case the suggestion is a bit tardy. The testimony revealed that many of the medical experts for plaintiffs or defendants have testified in these similar lawsuits pending in various districts. Such cases could have been consolidated for pretrial matters under 28 U.S.C. § 1407. *In re Japanese Electronic Products Antitrust Litigation*, 388 F.Supp. 565 (Jud.Pan.Mult.Lit. 1975); *In re Gypsum Wallboard*, 303 F.Supp. 510 (Jud.Pan.Mult.Lit.1969). The transferee judge could have considered whether transfer for trial under 28 U.S.C. § 1404 would have been appropriate. Even if pretrial matters only were handled in one district, the use of a single video-tape deposition for each medical expert would have been beneficial.

The result of such similar litigation being tried in various district courts may well be a divergence of decisions, which not only will affect the litigants but until higher courts have achieved some uniformity, will also leave flight attendants, ground employees and employer airlines which are not parties to these cases in some doubt as to what their policy should be. Of course, there is always the risk that such uniformity may not occur. Last but not least, the unnecessary duplication of judicial effort has been substantial.

This trial involves the controversy over National's maternity leave policy with respect to its "stop-start" provisions; that is, when does a pregnant flight attendant have to stop flying and when must she resume her duties following the birth of her child? Other maternity leave issues have been stayed pending resolution by the Supreme Court of the United States of two cases which present similar issues.[1] Another segment of these consolidated actions, challenging defendant's height-weight limitation policy, has been resolved by separate decision. *Leonard v. National Airlines, Inc.,* 434 F.Supp. 269 (S.D.Fla.1977).

On July 15, 1976, this court certified the maternity issue as a class action, pursuant to Rule 23(b)(2), Fed.R.Civ.P. and defined the class as follows:

> "Female personnel who have been employed by National Airlines, Inc. on or after January 29, 1972, or who may become so employed in the future, divided into a subclass of female flight cabin attendants represented by Susan Gail Leonard and Marilyn White, and a subclass of non-flying female employees represented by Barbara Ann Gardner and Sherry Knipple."

At the same time the court ordered that the case of *Barbara Ann Gardner, et al. v. National Airlines, Inc., et al.,* 75–1968–Civ–NCR, be transferred for trial to the Southern District of Florida from the Eastern District of Virginia, pursuant to 28 U.S.C. § 1404.

National Airlines is one of the smaller of the trunk carriers in the United States, employing approximately 1225 female flight attendants and 75 male flight attendants. National employed its first male flight attendant, or steward,[2] on April 6, 1973. Twenty is the minimum age for flight attendants at National and 91% are 33 years of age or under. Over half of them fall in the age group from 25 to 30.

In 1967, National entered into a collective bargaining agreement with the Airline Pilots Association (ALPA),[3] a labor organization then representing its flight cabin attendants, and included in the agreement a contract provision regarding marriage and pregnancy. This section provided as follows:

---

1. *Satty v. Nashville Gas Company,* 522 F.2d 850 (6th Cir. 1975), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977); *Berg v. Richmond Unified School District,* 528 F.2d 1208 (9th Cir. 1975), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977).

2. For the sake of brevity, the terms "male flight attendant" and "female flight attendant" are used interchangeably with "steward" and "stewardess".

3. On August 18, 1976, ALPA was replaced by the Transport Workers Union (TWU) as the flight attendants' certified bargaining agent. TWU has been joined as a party defendant and ALPA remains as a party defendant.

"Effective July 10, 1967 marriage shall not disqualify a stewardess from continuing her flight duties except as otherwise provided below.

1. All married stewardesses in the employ of the Company subsequent to that date must, on penalty of discharge without recourse, immediately advise the Company of their marital status (including subsequent divorce.)

2. On knowing she is pregnant, a stewardess must resign or be discharged without recourse."

In February of 1971, the airline and the Union entered into a letter of agreement which modified the maternity termination provision.[4] This modification, which is National's current policy, requires a flight attendant to notify the company in writing as soon as she becomes aware she is pregnant. The flight attendant is immediately placed on unpaid maternity leave. The policy also requires a flight attendant to return to work within 60 days following the birth of her child. Failure to comply with either the notice requirement or the return to work requirement results in termination of employment.

If a flight attendant is unable to return to work within 60 days and timely notifies the company, supported by medical justification from her personal physician, she may request an extension of her leave to a maximum of six months after delivery. While in theory extensions are subject to the approval of National's medical examiner, the testimony was uncontradicted that timely requests for extension are automatically granted.

The maternity leave policy covering non-flying personnel employed by National Airlines is different from the one previously described for stewardesses. Non-flying employees are subject to their being placed on unpaid maternity leave at the end of their fifth month of pregnancy. From 1970 to 1975, station employees were required to commence their leave not later than the end of the seventh month of pregnancy.

In 1975, National entered into letters of agreement with the Communications Workers of America, representing the radio and teletype operators and the Air Line Employees Association, International, representing the station employees,[5] which modified the policy. The current policy permits the employee to work past the end of her fifth month if written notice of pregnancy is provided the company and if the employee's personal physician certifies, on a monthly basis, her continued ability to work. This provision is contingent upon the determination by an employee's supervisor that she is capable of continuing her job.

The agreement requires non-flying employees to return to work within 60 days following the birth of her child. It has been National's practice to allow its non-flying employees to extend this return period through the use of personal leave. Personal leaves for non-pregnancy-related medical disabilities may be extended to a maximum of three years, whether the employee is a flight attendant or non-flying.

■ Barbara Ann Gardner was employed as a clerical ground employee by National Airlines in 1970. In 1972, she became pregnant and in July of that year she suffered a miscarriage. She underwent minor surgery as a result of her miscarriage and after a period of bed rest returned to work.[6]

Sherry Knipple was employed by National Airlines in 1967 as a stenographer. When she became pregnant in 1972, she informed National of her pregnancy. Also submitted to National was a statement from her personal physician estimating her date of delivery. Upon receipt of these

4. Some of the interesting background accompanying National's change of policy is detailed in *Johnson v. National Airlines, Inc.,* 434 F.Supp. 266, 267–268 (S.D.Fla.1977).

5. Neither of these unions are parties to the lawsuit.

6. Ms. Gardner seeks payment of sick pay for the period during which she was absent from work. Although this claim has been severed and stayed, see note 1, *supra,* she may still act as class representative. See *Long v. Sapp,* 502 F.2d 34, 43 (5th Cir. 1974).

documents, National's industrial nurse informed Ms. Knipple and her supervisor that Ms. Knipple would not be permitted to work past the end of her seventh month of pregnancy.

Marilyn White was employed by National in 1963 as a flight cabin attendant. In March of 1973, Ms. White orally informed National that she was pregnant. Two weeks later Ms. White's personal physician submitted a written statement confirming the pregnancy and estimating the date of delivery as July 22, 1973. Ms. White was approximately at the beginning of the sixth month of her pregnancy when she informed National and pursuant to its policy National discharged Ms. White on April 12, 1973, one day after receiving her physician's written statement.

Susan Gail Leonard was employed by National in 1968 as a flight cabin attendant. In August of 1972, Ms. Leonard went on sick leave and while on leave discovered that she was pregnant. Thereafter she awaited the birth of her child on unpaid maternity leave. Her child was born on April 13, 1973. On July 1, 1973, Ms. Leonard wrote to National requesting an extension of her maternity leave. National's then Director of Flight Attendants subsequently advised Ms. Leonard that her letter was not received until July 5. Because she had failed to return to work nor notify the company within 60 days following the birth of her child, pursuant to the policy, she was terminated at once.[7]

■ This court previously concluded that plaintiffs Gardner, White and Leonard each filed her charge of discrimination within the 180 day period following the occurrence of the allegedly discriminatory act. 42 U.S.C. § 2000e–5(e). Likewise, the complaints herein were each filed within 90 days after receipt by plaintiffs Gardner, White and Leonard, of notice of right to sue. 42 U.S.C. § 2000e–5(f). Plaintiff Knipple never filed a charge of discrimination with the Equal Employment Opportunity Commission (E.E.O.C.). Although she is precluded from suing on her own behalf, *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970), she may stand as class representative, within the periphery of the E.E.O.C. claim filed by her co-plaintiffs, for an appropriate subclass. *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968).

It is undisputed that defendant National Airlines, Inc. is an "employer" as defined in 42 U.S.C. § 2000e(b), and that ALPA and TWU are "labor organizations" within the meaning of 42 U.S.C. § 2000e(c). Plaintiffs have alleged that National's maternity policy violates 42 U.S.C. § 2000e–2(a)(1), (2) and that the collective bargaining agreement to which the Unions were parties violates 42 U.S.C. § 2000e–2(c)(3).

■ There are two main issues of law which must be resolved by any court faced with an employment policy asserted to violate Title VII. First, the court must determine whether plaintiffs have sustained their burden of proving a violation of Section 703(a), 42 U.S.C. § 2000e–2(a). If, and only if, that burden has been met, may the court reach the second issue: whether the defendant has proved its policy constitutes a bona fide occupational qualification, as defined in Section 703(e), 42 U.S.C. § 2000e–2(e).

Prior to *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Court of Appeals which addressed the issue had unanimously held that discrimination based upon pregnancy was discrimination based upon sex. See *Communications Workers of America v. A.T.&T. Co.*, 513 F.2d 1024 (2d Cir. 1975); *Wetzel v. Liberty Mutual Insurance Co.*, 511 F.2d 199 (3d Cir. 1975), *vacated on juris. grounds* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); *Gilbert v. General Electric Co.*, 519 F.2d 661 (4th Cir. 1975); *Satty v. Nashville Gas Co.*, 522 F.2d 850 (6th Cir. 1975); *Berg v. Richmond Unified School District*, 528

---

**7.** Other aspects of Ms. Leonard's termination are set out in *Leonard v. National Airlines, Inc.*, 434 F.Supp. 269, 272 & n.5 (S.D.Fla.1977).

F.2d 1208 (9th Cir. 1975); cf. *Tyler v. Vickery*, 517 F.2d 1089, 1097–99 (5th Cir. 1975).[8] In *Gilbert*, the Supreme Court held that every distinction based on pregnancy is "not in itself discrimination based on sex." *General Electric Co. v. Gilbert, supra,* 429 U.S. at 133–139, 97 S.Ct. at 407–10. It is this court's task then to determine whether National's maternity leave policy is discrimination based on sex.

*Gilbert* was decided two years after *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), and relied substantially on its reasoning. See *General Electric Co. v. Gilbert, supra,* 429 U.S. at 133–139, 97 S.Ct. at 407–10. *Geduldig* involved the equal protection clause rather than Title VII. Both cases involved a challenge to disability insurance programs which excluded pregnancy as one of the covered risks. Because the coverage afforded by the disability insurance was extended equally to male and female employees, the Court concluded:

> " 'There is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not.' "

*General Electric Co. v. Gilbert, supra* at 135, 97 S.Ct. at 408 (quoting from *Geduldig v. Aiello, supra* 417 U.S. at 496–97, 94 S.Ct. 2485). In substance, *Gilbert* held that under-inclusiveness does not amount to discrimination. *Id.* 429 U.S. at 133, 97 S.Ct. at 407. The issue in the instant case is one of unequal inclusiveness.

In *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), decided earlier in the same term as *Geduldig,* the Supreme Court addressed the issue of mandatory maternity leaves. The Court in *LaFleur* held that requiring a woman to begin maternity leave at a predetermined point in her pregnancy, without

regard to her individual ability to work, constituted a violation of the due process clause of the fourteenth amendment.[9] *Id.* at 647–48, 94 S.Ct. 791. The Court took pains to observe that Title VII was inapplicable to governmental employers at the time the complaints involved in *LaFleur* were filed.[10] *Id.* at 638–39 n. 8, 94 S.Ct. 791.

The Supreme Court, as previously noted, has granted certiorari in two cases which present, *inter alia,* the issue before this court. Presumably, if *Gilbert* were dispositive of the issue, the Court would have vacated and remanded as it did with *Communications Workers, supra.* Moreover, *Geduldig* left the door open to show that an otherwise valid classification based upon pregnancy was merely a pretext for gender-based discrimination. *Geduldig v. Aiello, supra* 417 U.S. at 496–97 n. 20, 94 S.Ct. 2485. *Gilbert* iterated that view and added that a showing under Title VII of the gender-based effect of a pregnancy policy would sufficiently meet the required burden of proof. *General Electric v. Gilbert, supra* 429 U.S. at 135–137 & nn. 14 & 15, 97 S.Ct. at 408–09.

■ This court, in deciding whether *Gilbert* is to be an absolute bar to plaintiffs' recovery, has considered the E.E.O.C. guidelines asserted to support plaintiffs' position. 29 C.F.R. § 1604.10(a) provided in pertinent part:

> "(a) A written . . . employment policy or practice which excludes from employment . . . employees because of pregnancy is in prima facie violation of Title VII."

It is clear that such guidelines are not to be considered in the same vein as Congressionally authorized regulations which have the force of law. *General Electric Co. v. Gil-*

---

**8.** Petitions for certiorari were granted in *Satty* and *Berg,* see note 1, *supra.* The decision in *Communications Workers* was vacated in light of *Gilbert,* 429 U.S. 1033, 97 S.Ct. 724, 50 L.Ed.2d 744 (1977).

**9.** *LaFleur* was brought as a § 1983 action in the District Courts. Both of those courts and the Courts of Appeals premised their rulings on the

equal protection clause rather than the due process clause.

**10.** The Equal Employment Opportunity Act of 1972, P.L. 92–261, 86 Stat. 103, extended Title VII coverage to governmental employees, but did not become effective until March 24, 1972.

*bert, supra* at 141, 97 S.Ct. at 411. They are, however, entitled to some consideration in determining legislative intent. *Id.*

■ The Supreme Court heavily discounted the guidelines in *Gilbert* for two reasons. First, they conflicted with the regulations promulgated by the Wage and Hour Administrator under the Equal Pay Act. Where the issue of compensation is contested in a Title VII claim, the provisions of the Equal Pay Act, 29 U.S.C. § 206(d), are controlling. 42 U.S.C. § 2000e–2(h). This ground is inapplicable in the instant case.[11]

■ The second reason for heavily discounting the guidelines was the late date of its promulgation as well as its conflict with a previous pronouncement of the E.E.O.C. *General Electric Co. v. Gilbert, supra* at 147, 97 S.Ct. at 414. However, while not promulgated contemporaneously with the enactment of Title VII, the guidelines were promulgated shortly after the enactment of the Equal Employment Opportunity Act of 1972, which amended Title VII. See *Cleveland Board of Education v. LaFleur, supra* 414 U.S. at 638–39 n. 8, 94 S.Ct. 791. In the report accompanying H.R. 1746, the bill eventually enacted after conference, the following enlightening observations were made:

"Women are subject to economic deprivation as a class. Their self-fulfillment and development is frustrated because of their sex. . . .

"Such blatantly disparate treatment is particularly objectionable in view of the fact that Title VII has specifically prohibited sex discrimination since its enactment in 1964. . . .

". . . [D]iscrimination against women continues to be widespread, and is regarded by many as either morally or physiologically justifiable."

H.Rep. 92–238, 92d Cong., 2d Session. (Reprinted at 2 U.S.Code, Cong. and Administrative News, pp. 2140–41 (1972)). Thus, to the extent that the 1972 amendments to Title VII are viewed as a reaffirmation of Congressional purpose in the area of eliminating sex discrimination, the E.E.O.C. guidelines promulgated as 29 C.F.R. § 1604.10(a) are relevant, timely, and entitled to greater weight than was accorded the guideline in issue in *Gilbert.*

Finally, the court must consider the weight to be accorded *LaFleur.* Although not a Title VII case, its holding must be relevant to the issue before this court. If the Supreme Court were to hold in *Satty* and *Berg* that Title VII does not reach the issue of mandatory maternity leaves, an anomalous situation would result. Last term, in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court held that constitutional standards were not the same as those of Title VII. *Id.* at 238, 96 S.Ct. at 2047. The clear import was that the standards employed in Title VII are less restrictive. *Ibid.* Thus, to hold that mandatory maternity leave requirements, without regard to individual ability to work, does not create a prima facie case under Title VII would result in the constitutional standard promulgated in *LaFleur* being less restrictive than the one in Title VII.

The court must conclude that resolution of the issue before it is not *per se* foreclosed by *Gilbert.* Therefore, the court now proceeds to determine whether plaintiffs have met their required burden under Section 703(a). Very little testimony was directed to a showing of prima facie discrimination. *Gilbert* having foreclosed the contention that pregnancy *per se* is equivalent to sex *per se,* the hurdle remains for plaintiffs to demonstrate that National's policy has an impact which falls more heavily upon females.

The court starts with the principle that employment is a protected interest, see *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Carey v. Greyhound Bus Co.,* 500 F.2d 1372 (5th Cir.

---

11. The issue of maternity benefits has been stayed. See note 1, *supra.* Moreover, the guideline involved in *Gilbert* was 29 C.F.R. § 1604.10(b), which is a different subsection than is presented here.

1974), as is the decision to bear children. *LaFleur v. Cleveland Board of Education, supra.* Since April 6, 1973, both male and female flight attendants have been employed by National. Each is subject to equivalent terms and conditions of employment, see *Leonard v. National Airlines, Inc.,* 434 F.Supp. 269 (S.D.Fla.1977), with one exception—females suffering from the "disability" of pregnancy must cease working. Thus, National's policy deprives females of their means of support during pregnancy.

Evidence was produced that females have both the capacity and desire to work during their pregnancy. Two of defendant's flight attendants testified about their experiences while on maternity leave. One, Ms. Maiorino, a flight attendant for seven years, became pregnant in 1973. When she discovered her pregnancy—during her fifth month—she notified National and went on leave. Ms. Maiorino testified that she had no difficulties in performing her duties while pregnant, although she may have taken one to three sick days during that period. Ms. Maiorino sometimes suffers from fluid in her ears and when that occurs, she calls in sick until medication relieves the problem. However, she makes the determination whether she will fly.

Ms. Olhausen has been a flight attendant with National for 11 years. She became pregnant in 1973, working until the end of her fourth month (16–17 weeks). She went on leave at that time because she was beginning to show and was afraid of being terminated. While on leave she worked at her husband's restaurant; the implication drawn from Ms. Olhausen's testimony was that she worked in the restaurant because her family needed her income. When she went on leave and her income ceased, her husband could not afford to hire someone to do the work she would do. It is this economic factor which distinguishes this case from *Gilbert.*

■ Under National's policy, when a female flight attendant knows she is pregnant she must cease working, terminating her income. There is no other condition which automatically results in such deprivation. Because pregnancy is an exclusively female condition, the policy inevitably has a disproportionate impact on females. *Gilbert* was, at least in part, premised on the position that General Electric need not have provided *any* disability package. *General Electric Co. v. Gilbert, supra* at 140, n. 18, 97 S.Ct. at 410. Without the employment of flight attendants, National cannot operate. 14 C.F.R. § 121.391(a). This is not the only impact of the policy, however, which falls disproportionately upon females.

■ Although it is only those females who become pregnant who are overtly affected by the operation of this policy, all females are potential victims of this policy. Private Title VII suits are designed to attack the policy, not just its individual effects. See *Oatis v. Crown Zellerbach Corp., supra.* Females generally have the capacity to become pregnant and give birth to a child. National's policy impinges upon this choice.

The Supreme Court, in a growing line of cases, had held that this decision is fundamental and one reserved exclusively for the mother. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Cleveland Board of Education v. LaFleur, supra; Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). As noted previously, the Court condemned a similar policy in *LaFleur* for restricting this right. Although *LaFleur* was decided on due process grounds, which is inapplicable to private employers, the court considers this to be a distinction without a difference. To the extent that Congress intended to abolish all employment practices which impact more heavily upon females than males, *LaFleur* suggests that absent a legitimate government interest (or BFOQ in Title VII scheme) National's policy cannot stand. The fact that National did not intend its policy to discriminate against females is immaterial. *Griggs v. Duke Power Co., supra.*

The court concludes that defendant's policy discriminates against females in violation of Title VII. Although the evidence

was not overwhelming, it seems clear that many flight attendants are capable of working during pregnancy and some need the income from their employment. There may be some stewardesses who delay their attempt to become pregnant because they cannot afford to go without work for six to eight months. Finally, no other physical condition is treated by National as *per se* disqualifying although the other disqualifying conditions are medical disabilities.

Before proceeding to National's BFOQ defense the court deems it necessary to make a number of observations. First, the policy in question does not have a neutral characteristic upon which disqualification is based ("sex plus" discrimination). See *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Pregnancy is inevitably sex-linked. Secondly, although pregnancy may be the result of a voluntary act, only the female participant must suffer the consequences under National's policy. Finally, although the evidence at trial was specifically directed towards the policy affecting flight attendants, the conclusions set forth above apply equally to the non-flying subclass.

### BONA FIDE OCCUPATIONAL QUALIFICATIONS DEFENSE

National asserted that its policy was justifiable as a BFOQ defense on a number of bases: that a stewardess who continues to fly while pregnant is potentially dangerous to the safety of (a) passengers, (b) the fetus, and (c) the flight attendant herself. The court in this opinion will only consider the defense as it relates to the safety of passengers. There has been no evidentiary showing that flying while pregnant is dangerous to the health of a stewardess.

Although there has been some testimony presented by National that pregnant flight attendants continuing to fly causes an increase in the number of spontaneous abortions as well as defective babies, the evidence is in conflict. Apparently, data compiled on Western Airlines' flight attendants indicates an increase in the spontaneous abortion rate and other complications, but that data is still incomplete. The experience of Northwest Airlines after having permitted pregnant flight attendants to fly for nearly four years, as well as other testimony of no fetal anomalies despite 2500 pregnant stewardesses a year, supports a finding that no fetal anomalies have resulted from pregnant stewardesses continuing to work. In addition, the court considers that the question of harm to the fetus is basically a decision to be made not by this court, but by the mother of the fetus. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Poe v. Gerstein,* 517 F.2d 787 (5th Cir. 1975), aff'd sub nom. *Gerstein v. Coe,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).

The F.A.A. requires that a plane be evacuated of passengers in 90 seconds. 14 C.F.R. § 25.803(c). The bulk of the flight attendants' training prior to beginning flight duties is devoted to safety techniques. See 14 C.F.R. § 121.421. At least once a year recurrent training is required of all flight attendants and 100% of that time is devoted to a review and up-dating of safety techniques. 14 C.F.R. § 121.-427(b)(3). National did not require agility drills of its flight attendants until recently. It now requires timed agility drills, including the giving of voice commands, opening the forward cabin door and deploying the escape chute.

Most of National's routes involve flying over water, more so than most of the trunk carriers in the United States. In addition to the Miami-London run, the Miami, Ft. Lauderdale, or West Palm Beach flights to Washington, New York or Boston all involve considerable distances over water as do the flights from Florida across the Gulf to New Orleans, Houston and on to Los Angeles or San Francisco.

By stipulation the court and counsel inspected a DC-10, viewing the safety equipment aboard as well as the working spaces provided for flight attendants. A Boeing 727 was also inspected. These are the only two aircraft types being operated by Na-

tional at this time.[12]  The court had the opportunity while aboard the 727 to remove the window exit, open the front cabin door and inflate the emergency slide as well as leave the plane by that route.

The life raft on a 727 weighs 130 pounds and it requires 70 to 100 pounds of force to open the 727's door.  In the DC–10 the cart weighs 200 pounds when loaded; the galley in the DC–10 is below the main cabin deck and has a narrow escape hatch up a ladder leading to a main deck aisleway.  The court must conclude that the hatch requires both agility and trim girth to make a quick exit.[13]

Defendant insists that a pregnant flight attendant would not be able to perform her safety functions as effectively in the event of emergencies.  Plaintiffs concede that such would be a bona fide occupation qualification if true, but strongly dispute that contention.  Much of the evidence was directed to this question and the parties called eminent physicians to testify.

The consensus of plaintiffs' medical experts[14] is that if a flight attendant could perform safety tasks before pregnancy, she could do so while pregnant, at least during the first trimester (thirteen weeks) and after that it would be an individual matter.

A staff meeting of the obstetricians at Mayo Clinic produced the following conclusions: All saw no reason why stewardesses could not fly during the first trimester but felt it was not advisable to permit her to fly during the last trimester.  This conclusion was based on her ability to work; no concern was expressed about the fetus.  They concluded that eventually the flight attendant will have some abdominal distention and when this reaches 6 to 8 inches it will be difficult for her to lift or push, but such a determination should be on an individual basis.

The final consensus reached by Mayo's staff was that a pregnant flight attendant could fly in the first trimester, it's an individual matter in the second, and none of the stewardesses should fly during the final trimester.  Dr. Carter, Northwest's medical director proposed the consensus be adopted as Northwest's policy.  Northwest did so in 1973 and it is the only trunk carrier in the United States to have done so.  During the second trimester a Northwest stewardess who wants to fly submits a monthly statement from her doctor that she is fit for duty.  Nearly all of the Northwest stewardesses leave after 3½ to 4 months of pregnancy—some stay on who apparently need the income.  There is no evidence that the policy at Northwest has resulted in more injuries.

The longest run in Northwest's system, block to block, is 11 hours (Seattle to Tokyo).  There have been no complaints at Northwest with respect to the performance of pregnant flight attendants and there have been no miscarriages while on duty.  Northwest tries to limit the number of pregnant stewardesses on any one flight so that there is not more than one per flight.

12.  National flies two variations of each plane: DC–10–10 and DC–10–30 and both the 727–35 and 727–235.

13.  During nearly three years of active duty in the Navy and some twenty additional years of midshipman and Naval Reserve cruises, the court has made many ascents and descents through various hatches on different types of ships.  Only two that were more difficult to navigate come to mind and neither of them presented such close quarters.

14.  In order of appearance:
Dr. Jack Pritchard is Professor of Obstetrics at the University of Texas—Southwestern Medical School and Chief of Obstetrics at Parkland Hospital in Dallas; his major research area is hematology and he is the senior editor of the text, *Williams on Obstetrics;*

Dr. Earl T. Carter is Chairman of the Division of Preventive Medicine at Mayo Clinic and medical director for Northwest Airlines since 1967;
Dr. Andre Helegar is Professor of Obstetrics at Georgetown with two years' study in aviation medicine at the University of Paris;
Dr. Robert Creasy, a doctor from San Francisco, teaches obstetrics at the University of California and specializes in fetal and maternal physiology at the Cardiovascular Research Institute.
Dr. Helegar did a special study in Peru on the effect of high altitude on pregnant women and llamas and Dr. Creasy prepared a master's thesis on the effects of high altitude on sheep.

Northwest stewardesses have also adopted maternity uniforms which Dr. Carter opposes. His conclusion is that if a flight attendant has to use one, it is because her abdominal strength has relaxed to the point she should stop flying until after the delivery of her child.

Much testimony dealt with the fact that the artificial environment in aircraft cabins is maintained at an altitude of 6,000 to 7,000 feet. The altitude factor produced the sharpest conflict in the medical testimony. Although the court found the testimony of medical experts extremely interesting on the effect of altitude on pregnant women, animals and their offspring,[15] it does not feel compelled to decide between the conflicting conclusions of medical experts. The key question posed by the issue of cabin altitude is whether it adversely affects the work performance of flight attendants so that her capability to discharge her safety responsibilities is impaired.

## MEDICAL EVIDENCE PRESENTED BY NATIONAL

The consensus of defendant's experts[16] from their observations or treatment of stewardesses indicate many complaints of swollen feet and fatigue on long runs, even when not pregnant; that they have more complaints of backaches and swollen feet than do, for example, schoolteachers; that it is a vigorous occupation and a number of the dysfunctions of pregnancy, such as nausea, edema, urinary frequency, tiredness or fatigue, and varicosity, are all incompatible with the duties of flight attendants; and that the work efficiency of pregnant women is less.

The court expressed its concern during the trial about the lack of evidence on the question of the metabolic costs of pregnancy on stewardesses. Some evidence from a study indicated that a waitress' metabolic costs were equal to that of an assembly line worker and greater than someone doing standing work such as a carpenter. Flight attendants do more than merely serve food and beverages; therefore the metabolic costs of those duties could affect their capability for safety-related duties.

National attached pedometers to a number of its flight attendants prior to the next taking of evidence and the readings varied from 4/10ths of a mile with a light load from Miami to LaGuardia to 3.2 miles in coach on a half-full flight from London to Miami.[17] The court was somewhat surprised that the distances were not longer because the court can take judicial notice that on many flights, especially short dinner flights, the flight attendants are working at a fast, at times almost frantic, pace.

National's longest run is the 9 hour flight from London to Miami and the longest on-duty flight is 11 hours and 55 minutes, with the longest stop being 35 minutes. One 3-day-trip has 19 landings and one 4-day-trip has 22 landings. The pedometer readings on these multiple landing trips approximated or exceeded the miles walked on the long non-stop flights.

## THE TEST FOR BFOQ AS TO FLIGHT ATTENDANTS

The hurdles which must be cleared by National before it can discharge its burden

---

15. As indicated earlier, the court does not consider the effect on the fetus as material to the issues of BFOQ.

16. Dr. William Cooper, Clinical Professor of Obstetrics at George Washington, described himself as a practicing obstetrician rather than a research obstetrician;
Dr. William H. Whaley, an internist and clinical faculty member in internal medicine and hematology at Emory, is a medical consultant for at least six airlines;
Dr. William Winter, formerly an obstetrician, currently is director of the medical research program for NASA, and has studied 71 commercial air crashes as well as serving on the boards investigating military crashes; he previously taught at the school of aviation medicine at Pensacola and evaluated 34 female applicants for the ten finalists for the aerospace program; and
Dr. Fred Hemming is assistant director of medical services of Canadian Pacific Airlines, an airline which is required by Canadian law to permit pregnant flight attendants to continue working.

17. Not surprisingly, the pedometer reading was about one-third as much in first-class.

of establishing a BFOQ are contained in a series of Fifth Circuit cases. *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir. 1976); *Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385 (5th Cir. 1971); *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228 (5th Cir. 1969).

The sequential hurdles are outlined in *Usery.* Initially, the *Diaz* test must be satisfied:

"*Diaz* mandates that the job qualifications which the employer invokes to justify his discrimination must be reasonably necessary to the essence of his business— here, the safe transportation of bus passengers from one point to another. The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." 531 F.2d at 236.

If National can pass muster under *Diaz* then the *Weeks* two-prong test must be met:

"whether it had reasonable cause, that is, a factual basis, for believing that all or substantially all [female flight attendants who achieved certain states of pregnancy] would be unable to perform safely and efficiently the duties of the job involved, or whether it is impossible or impractical to deal with [such persons] on an individual basis." [Modified from the question set forth in *Usery* to fit this case.] *Id.* at 236.

The court amplified what it meant by unreasonable job qualifications in the light of the safety risk in the following footnote in *Usery*:

"We believe that courts must afford employers substantial—though not absolute—discretion in selecting specific safety standards and in judging their reasonableness." *Id.* at 236 n.30.

The court discussed the significance of safety of passengers and members of the public in *Usery* and indicated that:

" . . . [t]he employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb. The employer must, of course, show a reasonable basis for its assessment of risk of injury/death". *Id.* at 238.

Having determined that the plaintiffs have made a prima facie case of discrimination under Title VII, this court must determine whether National has established its defense of BFOQ for maintaining its current policy of requiring that a stewardess stop flying as soon as she knows she is pregnant. If the court determines that the present policy is not justified as BFOQ, then the court must determine from the evidence at what stage of pregnancy, if any, may a policy requiring suspension of employment of flight attendants and ground personnel respectively be enforced or should it be determined on an individual basis, or whether some combination of these factors is appropriate. Finally the court must determine if there is any justifiable BFOQ for National's "start" provision under its "stop-start" maternity leave policy.

National's present policy has produced some interesting data: By counting back from the dates of birth National determined that the average flight attendant flies three months while pregnant before grounding herself. In some instances flight attendants have flown longer, some as long as five months.

■ National's own data has produced no evidence of difficulty resulting from these pregnancies other than one spontaneous abortion on a flight from LaGuardia to Miami in 1972. Consequently, as a practical matter National's policy permits flight attendants to complete their first trimester of pregnancy with passing marks. In addition, the evidence is overwhelmingly against National in connection with the first trimester: It compels a finding that a pregnant stewardess can perform any of the safety tasks required of her during her first trimester of pregnancy that she could perform when non-pregnant. It is true that most spontaneous abortions occur during the first trimester of pregnancy as does

nausea (morning sickness) and both are rare after that. However, National's own data as well as that of Northwest, do not support a conclusion that a pregnant flight attendant in her first trimester is a safety hazard aloft.[18]

█ As for the third trimester, plaintiffs' own medical experts do not suggest that pregnant stewardesses should be flying. Dr. Pritchard does suggest that an occasional stewardess could still perform her safety duties; however, the evidence is overwhelming[19] that flight attendants should not fly during the final trimester. Under the *Usery* test, the court must conclude that as a blanket rule National may require its flight attendants not to fly during the final trimester of pregnancy.

The difficult area is the middle trimester. There is no body of data—fortunately—to show whether stewardesses in their twentieth week of pregnancy have been able to man their safety stations in the event of a crash or forced evacuation. Consequently, the court must sift through the conflicting medical opinions and the evidence relevant and material to the issue.

█ The court concludes that National has established from the evidence that a stewardess should not fly past the twentieth week of pregnancy but that National has failed to establish that a pregnant flight attendant should be automatically barred from flying from the thirteenth to the twentieth week. In that period of pregnancy the court finds that whether a stewardess can discharge her safety factors is an individual matter and should be treated accordingly. After the thirteenth week a medical certification that the flight attendant is medically fit and capable of carrying out her assigned duties can be required before the flight attendant can continue her flight duties.

The court is persuaded by the evidence that many physicians may well not understand the rigors of the duties of a flight attendant and agrees with the medical opinion that suggests doctors will certify largely what their patients want them to do.[20] Consequently, as approved in *Cleveland Board of Education v. LaFleur*, 414 U.S. at 647 n.14, 94 S.Ct. 791, in the period from the end of the first trimester to the twentieth week of pregnancy, National may require certification from a physician of its choosing before the flight attendant may perform her flight duties.

█ The court further finds the conclusion of one of plaintiffs' medical experts, Dr. Carter, the medical director for Northwest to be quite sound: if a stewardess must wear maternity clothes, her abdomen has been distended and weakened to the point that she should not be flying. The court must conclude that at that stage of pregnancy she could not be reasonably expected to perform such safety duties, among others, as opening the door of a 727 and inflating the safety chute; pulling a 130 pound life raft from its overhead compartment; or clambering through the escape hatch from the galley of a DC–10 in order to assist the evacuation of passengers.

Two factors persuade the court that 20 weeks is the appropriate termination point for flight attendants. First, National flies a great number of over-water routes with substantial over-water flight time.[21] The

---

18. Plaintiffs assert that many of the symptoms suffered by pregnant women during the first trimester are similar to those suffered by a woman during menses, and stress that National does not require its female flight attendants to be grounded during those periods. National contends that most stewardesses bid around those periods; however, stewardesses lacking seniority to bid successfully do not have that option.

19. For example, this was the unanimous consensus by the Mayo Clinic staff which was the basis for Northwest's present policy.

20. The court admits to a certain degree of cynicism in this regard based upon several years of examining medical "excuses" written in behalf of prospective jurors.

21. Plaintiffs suggest that even if a pregnant stewardess wouldn't be able to discharge her safety duties, the court shouldn't find such inability as the basis for a valid BFOQ because National schedules more ("redundant") flight attendants than required by the F.A.A. on all flights except aboard the smaller 727. The suggestion that the court ignore an important safety factor is rejected.

weight of the life rafts, which flight attendants are required to deploy in an emergency, becomes an increasing burden upon a stewardess whose strength and agility decrease in the latter half of her pregnancy. The decreases in strength and agility are accompanied by marked changes in the development of the fetus—the second factor.

In the second trimester of pregnancy the top of the uterus will have left the bony pelvis and by the twentieth week be at the level of the navel. After that the uterus either moves up to halfway between the umbilicus and the mid-line of the bony chest cage or if the abdominal wall is relaxed the uterus may tend to fall forward. Dr. Pritchard, a witness for plaintiffs, testified there would be no changes in the muscle or skeletal system of a pregnant woman up to the twentieth week. After that it would depend on the position assumed by the pregnant uterus. He also testified that up to twenty weeks the changes in abdominal girth are quite modest. Dr. Creasy, another expert of plaintiffs, testified that the performance of duties by a flight attendant would be contra-indicated in the middle of the second trimester. These opinions of plaintiffs' experts, coupled with the unanimous opinion of defendant's medical experts that pregnant stewardesses shouldn't fly at all, compel the finding by the court that twenty weeks is the appropriate point for pregnant stewardesses to terminate flight duties.

## PRETEXT

Plaintiffs assert that National's policy, followed in concert by all other United States trunk carriers except Northwest, is merely a pretext and based upon marketing factors rather than upon safety. Plaintiffs point out National refused to hire male flight attendants until nearly two years after *Diaz* and that previously it successively refused to hire married stewardesses and later terminated married stewardesses when they became pregnant. Plaintiffs contend National has changed its policy only in a gradual grudging retreat and that the continuing basis for National's holding its ground was marketing considerations.

The Supreme Court has suggested several factors which are pertinent to the determination of whether an otherwise BFOQ is being employed as a pretext to violate Title VII. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co., supra*. One of these factors is the prior history of the company's employment policies as that relates to the issue of sex discrimination. *McDonnell Douglas Corp. v. Green, supra* at 804–05, 93 S.Ct. 1817. Another factor is the "job-relatedness" of the policy. *Griggs v. Duke Power Co., supra*, 401 U.S. at 431, 91 S.Ct. 849.

■ National strongly disputes that its present maternity leave policy has anything to do with marketing considerations. In fact, the evidence is uncontradicted that National's present maternity leave policy costs National money because it requires the training and employment of additional flight attendants to replace those who are grounded because of pregnancy. In addition, National contends that if marketing considerations were the reason for the policy, National would permit the stewardess to fly until she "shows" rather than until she "knows". Not only the evidence but the logic of that position supports National and vitiates the claim of pretext.[22]

Although plaintiffs' assertion would suggest that National's grudging retreat falls within one of the categories set forth in *McDonnell Douglas*, two factors weaken plaintiffs' position. First, it can hardly be said that the failure of National to conform immediately to the *Diaz* opinion constitutes sex bias in favor of males. See also *Stroud v. Delta Airlines, Inc.*, 544 F.2d 892 (5th Cir. 1977). Secondly, the policy under consider-

---

22. Plaintiffs' rejoinder is that the airlines insist on the pregnant flight attendants going on maternity leave as soon as she knows rather than when she shows because the latter would obviously be a policy based on marketing consider-

ations. However, the argument is speculative and not supported by any evidence while National's position is strongly supported by the testimony of Mr. Donlan, vice president for industrial relations, and was not contradicted.

ation is more intimately related to passenger safety than any of National's previous policies pointed to by plaintiffs. It is clear that as a common carrier National is required by its operating certificate to "assure safety in [its] air transportation" 49 U.S.C. § 1424. Accordingly, plaintiffs' claim of pretext must fail.

### THE "START" POLICY

National's "start" policy is designed and administered with much greater flexibility than its "stop" policy. A flight attendant, subject to medical approval and completion of recurrent training, may return to work at any time from the date of delivery to 60 days afterwards. If a flight attendant needs extra time, she may request an extension within the 60 day period and if it is supported by medical justification from her physician, it will be routinely and automatically granted.

Although the Court in *LaFleur* disapproved of the mandatory leave provisions under review, it did not conclude that the return to work provision was improper.[23] *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 648–50, 94 S.Ct. 791. That provision required medical certification prior to a teacher's returning to work. *Id.* at 648, 94 S.Ct. 791. Thus, this court perceives National's similar requirement as wholly proper. Moreover, as recurrent training is mandated by 14 C.F.R. § 121.427, the court is constrained to approve that restriction as well. Because a stewardess is not barred from returning to work at *any* time following delivery, National's "start" policy does not discriminate between the sexes and, thus, does not violate Title VII.[24]

The court recognizes that the 60 day provision presents some potential for abuse. However, the evidence is clear and convincing that National always accedes to a timely medically-supported request for extension. Because the court must make its de-

termination on the record, rather than in the abstract, the court can find no fault with that portion of the policy. See *Cleveland Board of Education v. LaFleur, supra* at 650 n.16, 94 S.Ct. 791.

### OTHER OBSERVATIONS

There are additional considerations which have been suggested by the evidence. However, the evidence was not developed and the court has not considered these matters in its determinations. For example, National suggests passengers might be so concerned for the safety of an obviously pregnant flight attendant that they would seek to assist her rather than to follow her instructions in an emergency.

It was also suggested that non-pregnant flight attendants oppose having to work with a pregnant stewardess. If there is such an attitude it would undoubtedly be aggravated as the stewardess became further advanced into her pregnancy. It may well be that other flight attendants would prefer not serving with a pregnant stewardess, either out of concern for her inability to perform safety duties or a suspicion that she might not be working as hard as she would if non-pregnant, or both; the court suspects this may well be the case, but it is only a suspicion and not considered by the court in this decision. Such matters are more properly decided within the labor union and in collective bargaining.

### SUMMARY

The court's holding for the female flight attendants has been set forth in detail. For National's female employees whose duties do not involve flying, the court concludes that there is no BFOQ justifying a termination of her employment prior to delivery, subject to the individual employee producing a satisfactory medical certification of her capability to perform her

23. One facet of the return to work rule of the *Cleveland* case was held improper: No return before the infant reaches the age of three months. The Virginia rule and the rest of the Cleveland rule were approved.

24. Ms. Olhausen, for example, had a baby on October 6, 1973, completed recurrent training ten days later and returned to work on November 1.

duties after the twentieth week. National has the right to require an examination and approval by a physician of its choosing.

It should be noted that National did not defend the claims of the ground employees and presented no evidence in support of a business necessity defense. Judgment to be entered in accordance with this memorandum opinion on the issue of liability. The trial on damages is to be set by further order of the court.

DONE AND ORDERED this 17th day of May, 1977.