Catherine M. BURWELL et
al., Appellees,

v.

EASTERN AIR LINES, INC., Appellant.

No. 78–1659.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 2, 1979.

Decided Aug. 29, 1980.

Paul M. Thompson, Richmond, Va. (Christine H. Perdue, A. W. VanderMeer, Jr., Hunton & Williams, Richmond, Va., William G. Bell, Jr., Miami, Fla., Richard P. Magurno, Eastern Air Lines, Inc., New York City, on brief), for appellant.

Jay L. Westbrook, Washington, D. C. (Robert B. Wallace, Surrey, Karaski & Morse, David R. Cashdan, Stephen L. Spitz, Lawyers' Committee for Civil Rights Under Law, Washington, D. C., on brief), for appellees.

Issie L. Jenkins, Acting Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Vincent Blackwood, Washington, D. C., on brief·for amicus curiae Equal Employment Opportunity Commission.

Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.

PER CURIAM:

██ This appeal raises several issues. For reasons set forth in the accompanying four opinions, the court has decided them as follows:

1. The court unanimously affirms that part of the district court's judgment that invalidated Eastern Air Lines' policy requiring pregnant stewardesses to forfeit seniority when they transfer to ground positions.

2. A majority of the court affirms that part of the district court's judgment that invalidated Eastern's mandatory pregnancy leave policy for stewardesses during the first 13 weeks of pregnancy. Three judges dissent on this issue.

3. A majority of the court reverses that part of the district court's judgment that invalidated Eastern's mandatory leave policy between the 13th and 28th weeks of pregnancy. Four judges dissent on this issue.

4. The court unanimously affirms that part of the district court's judgment that upheld Eastern's mandatory leave policy from the beginning of the 28th week of pregnancy.

SPROUSE, Circuit Judge, with whom HAYNSWORTH, Chief Judge, joins:

Eastern Air Lines appeals from a judgment finding it in violation of section 703(a)(2) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* The district court held Eastern responsible for impermissible sex discrimination against female flight attendants in three particulars. It ruled that Eastern's policies concerning mandatory pregnancy leave, seniority for temporary transfer to ground positions and reinstatement rights after maternity leave were all violative of Title VII.

The action was brought by Catherine Burwell and Jean Proctor in the United

States District Court for the Eastern District of Virginia, and by Sharyn Clayton in the Northern District of Alabama. The Clayton action was transferred to the Eastern District of Virginia and the actions consolidated. Also named as defendants were Local 550 of the Airline Steward and Stewardesses Association and Local 553 of the Transport Workers Union of America. There was a subsequent class action certification under Fed. R.Civ.P. 23(b)(1), (2). The certified class includes all female flight attendants employed by Eastern on October 27, 1972, who may be so employed in the future and who may be subject to the challenged employment practices.

At the time of the institution of this action, 90 percent of Eastern's flight attendants were female. Attacked by the plaintiffs were five Eastern employment practices or policies. There is no factual dispute as to the existence and nature of the policies. They are or were:

(a) A requirement that flight attendants must commence maternity leave immediately upon knowledge of pregnancy;

(b) A policy that pregnant flight attendants lose all accumulated seniority if they transfer to ground positions rather than taking maternity leave; flight attendants temporarily transferring to ground positions because of disabilities other than pregnancy continue to accumulate seniority;

(c) A policy fixing time limits on guaranteed rights to reinstatement of flight attendants taking maternity leave;

(d) The separate treatment of pregnancy under Eastern's Group Comprehensive Medical Insurance; and

(e) The exclusion of pregnancy from Eastern's paid sick leave policy and the impact of such exclusion on other conditions of employment.

The district court ruled in favor of the defendants on the medical insurance and sick leave issues. The plaintiffs have not appealed that decision. The court ruled for plaintiffs on the first three issues, enjoined Eastern and the unions from continuing them, and assessed back pay awards against only Eastern. The unions have not appealed any ruling and are not parties to this appeal. Eastern did not appeal the rulings holding invalid Eastern's policy on reinstatement of flight attendants after maternity leave.

The two issues remaining involve possible violations of section 703(a), Title VII[1] by Eastern practices or policies: (1) the policy requiring loss of seniority for pregnant flight attendants temporarily transferring to ground positions; and (2) Eastern's policy requiring forced mandatory leave upon knowledge of pregnancy.

We affirm the district court's ruling that Eastern's seniority policy governing temporary transfer to ground positions violates plaintiffs' Title VII rights. We affirm in part and reverse in part the court's rulings on the mandatory pregnancy leave policies.

I

## LOSS OF SENIORITY UPON TEMPORARY TRANSFER TO GROUND POSITION

The facts are simple and undisputed concerning Eastern's rules relating to the temporary transfer of pregnant flight attendants to ground positions. All flight attendants incurring a temporary disability are permitted to transfer to available ground positions during the disability from flight duty. This is a right resulting from

---

1. Section 703(a) of the Civil Rights Act, 42 U.S.C. § 2000e-2(a), states:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

the collective bargaining agreement which also provides that flight seniority shall continue to accrue during such temporary duty as follows:

Section 16(b) When a Flight Attendant is transferred to non–flying duties with the Company on account of physical incapacity or because of sickness or injury, the Flight Attendant shall retain and continue to accrue seniority during such period of sickness or injury for a continuous period of (3) three years.

Section 16(d), by reference to 16(b), restricts seniority retention and accrual rights to such transferees having a "physical impairment" or "sickness or injury":

Section 16(d) Except as provided in paragraph (b) above, Flight Attendants transferring to positions not directly related to Flight Attendant work will lose all seniority rights as Flight Attendants.

Under Eastern's interpretation of the collective bargaining agreement, the terms "physical impairment" and "sickness or injury" do not include pregnancy. But neither "physical impairment" nor "sickness or injury" are defined in 16(b). The collective bargaining agreement, therefore, does not specifically deprive pregnant flight attendants of their seniority retention rights. Rather, it is Eastern's unilateral interpretation which excludes pregnant flight attendants and results in the loss of seniority when pregnant flight attendants temporarily transfer to ground positions.

Eastern contends that this issue is governed by the Supreme Court's decision in *General Electric Company v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In *Gilbert* the Court held that the exclusion of pregnancy from an employer–funded sickness and accident insurance program is not a per se sex–based discrimination. "Gender–based discrimination does not result simply because an employer's disability benefits plan is less than all–inclusive." 429 U.S. at 138–39, 97 S.Ct. at 409.

The issue in the instant case does not involve a *Gilbert* determination. It is controlled instead by *Nashville Gas Co. v. Satty*, 434 U.S. 136, 93 S.Ct. 347, 54 L.Ed.2d 356 (1977). *Gilbert* involved insurance payments, and the exclusion of pregnancy benefits were actuarily implicit in the funding of the program. The Gas Company's practice, considered in *Satty*, deprived an employee returning from pregnancy leave of an employment right–all accrued seniority. Eastern's practice denying seniority to pregnant flight attendants upon temporarily transferring to nonflying duties, although different in procedure and degree, involves the same principle as *Satty*. The Court there said:

On its face, petitioner's seniority policy appears to be neutral in its treatment of male and female employees. If an employee is forced to take a leave of absence from his job because of disease or any disability other than pregnancy, the employee, whether male or female, retains accumulated seniority . . .. If the employee takes a leave of absence for any other reason, including pregnancy, accumulated seniority is divested. . . .

It is beyond dispute that petitioner's policy of depriving employees returning from pregnancy leave of their accumulated seniority acts both to deprive them "of employment opportunities" and to "adversely affect [their] status as employee."

434 U.S. at 140–41, 98 S.Ct. at 350 (footnotes omitted).

The Court went on to say:

We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in 'the scheme of human existence,'" 429 U.S. at 139 n. 17, 97 S.Ct. at 409 n. 17. But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.

434 U.S. at 142, 98 S.Ct. at 351 (footnotes omitted).

So here, as in *Satty*, Eastern's policy appears to be neutral in its treatment of male and female employees, but its impact was solely upon women, obviously depriving them of "employment opportunities" and adversely affecting their status as employees because "of their different role."

Eastern contends that the transfer policy as a part of its collective bargaining agreement is excepted from the operation of § 703(a)(2) by the bona fide seniority system provision of § 703(h) of Title VII. It is not necessary to even consider that contention. The provision of the collective bargaining upon which Eastern reportedly based this practice contains no language excluding pregnant flight transferees from its seniority provisions. It was only Eastern's unilateral interpretation that effected this grossly discriminatory result. The district court correctly held that the temporary transfer to ground position policy is a violation of plaintiffs' Title VII rights.

## II

### THE MANDATORY MATERNITY LEAVE POLICY

■ We next consider the issue of mandatory maternity leave upon knowledge of pregnancy.

The plaintiffs accuse Eastern of treating them discriminatorily in violation of section 703(a) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, hereafter section 703(a) of Title VII. Eastern argues the policies are justified because pregnant flight personnel could impede safe evacuation of passengers and hinder other safety procedures in the event of emergencies. They also argue, with less force, that the health of the attendant and her unborn child could be endangered. Any unequal treatment due to pregnancy, it says, is required for these reasons.

The central issue is whether Eastern's mandatory leave policy is necessary to the safe transportation of passengers as gauged by the criteria announced in *Robinson v. Lorillard Corporation*, 444 F.2d 791 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.C. 573, 30 L.Ed.2d 655 (1971), hereafter more fully discussed.

Eastern's requirement of leave upon knowledge of pregnancy is its only health-related involuntary leave requirement. There are no similar requirements for leave upon knowledge of any other health condition presenting a possible work impairment. Individuals incurring non–pregnancy related health problems are evaluated individually as to their ability to perform flight duties.

Eastern relies primarily upon a voluntary reporting system by attendants as to their pregnancies. Although pregnancies are routinely not reported until after the thirteenth week of pregnancy or until after the pregnancy is visually discernable, the duty remains on attendants to report and take leave as soon as they are aware of this pregnancy. There are no exceptions. The policy candidly prevents all pregnant flight attendants from working during pregnancy without regard to individual ability.

Creditable witnesses for both plaintiffs and defendant produced an evidentiary record detailing required performance in emergencies, some specific experiences of pregnant flight attendants during emergencies, and considerable medical testimony concerning pregnancy as it potentially affects performance of flight attendants during emergencies.

Flight attendants must be able to perform both routine and emergency duties. Nonemergency and routine duties require considerable physical exertion. Flight attendants may, on occasion, work up to fourteen–hour days. Flight attendants are required to push heavy food carts. There is danger from being injured by air turbulence. Testimony reflected that Eastern flight attendants reported an average of over thirty compensable injuries from turbulence annually over a four-year period.

Among emergency duties are opening doors and windows, assisting with life rafts, evacuating passengers, and proper psychological reaction to hijacking.[2]

**2.** The following list of duties was compiled by the Medical Committee of Air Transport Association.

   I. PHYSICAL ACTIVITIES

Lifting–up to 25 pounds regularly, 50 pounds occasionally.
Prolonged walking.
Prolonged standing.

The windows on some Eastern planes weigh 45 pounds. The exit doors ordinarily require 45 pounds of pressure to open and more if the door is jammed. If the exit doors are blocked, flight attendants must use alternate escape routes. During eight emergencies since 1954 flight attendants were required and did in fact perform practically all of the emergency procedures. Flight attendants have been required during specific emergencies to: climb from the airplane; climb onto the wing and open the exit windows from the outside; kick in the cockpit doors and exit through the windows which measured 16 × 18 inches; evacuate a paraplegic; evacuate several children and two invalids; and evacuate intoxicated and sleeping passengers.

Eastern's evidence established that during its flying experience there had been three pregnant flight attendants incapacitated due to pregnancy-related disabilities which began during flying trips, and that other pregnant flight attendants had become incapacitated due to nausea, morning sickness, and fatigue during flight. None of this occurred during an emergency.

The medical witnesses agreed that pregnancy is normally considered in three trimesters of approximately thirteen weeks each and that, roughly speaking, each trimester involves different health problems; that a normal, healthy woman experiencing a normal, healthy pregnancy would have little difficulty in performing the regular duties of a flight attendant until her girth has increased appreciably (this varies with the individual, but most often occurs shortly after the first trimester); that disabilities from abnormal pregnancy could prevent a flight attendant from performing either ordinary or emergency duties; that some of these disabilities are predictable as to individual women but some are unpredictable.

They also agreed that ten percent of all pregnancies result in miscarriages and ninety percent of these occur during the first trimester of pregnancy. Very few miscarriages can be predicted as to individual women. The medical experts and sources (including the Mayo Clinic, the doctors associated with Airline Transport Association and even some Eastern sources) point to the virtual unanimous conclusion that a pregnant flight attendant can adequately perform routine and emergency duties through the thirteenth week of pregnancy. The uncontradicted testimony was that pregnant women should not continue to work as flight attendants beyond the twenty-eighth week of pregnancy.

There was conflicting testimony concerning morning sickness, dizziness, fainting and the treatment of these conditions; anemia; placentia prania; toxemia; rupture of the marginal sinus; abruptia placentae; as to when these conditions occur; and the causative effect of physical exertion during routine and emergency procedures.

There have been no empirical studies nor evidence concerning the effect of flight duty upon an unborn child. Likewise there are no reliable statistics concerning the actual performance of pregnant flight attend-

Repeated bending and stooping.
Occasional overhead reaching.
Kneeling.
Pushing and pulling.
Ability to withstand recurrent training.
EMERGENCY DUTIES
Hemlich maneuver.
Lift out emergency window exits–weight 30 pounds each exit.
During evacuation: carry children, push passengers down slides, crawl over seats to reach exits and/or passengers, administer first aid.
Carry out overwater ditching and survival procedures.
Assist with life raft–weight, 120 pounds.

Assist passengers into raft.
Operate emergency equipment for flight attendant's own use.
Mouth–to–mouth resuscitation.
Psychological reactions to hijacking and in–flight emergencies.
II. WORKING CONDITIONS
Assisting "extra care" passengers.
Cabin pressurized to 5,000 feet.
Exposed to jet engine noise.
Irregular schedules.
Occasionally long working hours (up to fourteen continuous hours).
Temperature extremes (depending upon time of year and location).
Light to severe turbulence on occasion.

ants during emergency evacuations or other emergencies.

The trial court resolved conflicts in medical testimony principally in favor of the plaintiffs. The court, in a mixed finding of fact and law, found that for the first twenty weeks following conception a flight attendant undergoing a normal pregnancy can perform both normal and emergency duties as well as a non–pregnant flight attendant, that between twenty and twenty–eight weeks some can not but they can be identified, and as of the twenty–eighth week of pregnancy virtually all pregnant flight attendants should discontinue working as flight attendants. Its legal conclusion was that during the first thirteen weeks, flight duty should be entirely the choice of the flight attendant; from thirteen to twenty weeks, Eastern could require monthly written permission of her doctor; from twenty to twenty–eight weeks, flight duty could be conditioned on weekly permission from her doctor, and she could be prohibited flight duty after the twenty–eighth week.

The trial court concluded that the plaintiffs established a prima facie case of disparate impact discrimination;[3] that the defendant did not prove either a bona fide occupational qualification defense (hereafter BFOQ)[4] nor a business necessity defense;[5] and that even if a defense had been established it was, in part, a pretext.

We think the trial court was clearly wrong in its finding that pregnant flight attendants who will experience abnormal health incidents during their pregnancies can be uniformly identified prior to the onset of such incidents. There is very little, if any, evidence to support that finding. We do not otherwise disturb the district court's findings of subsidiary facts relating to the characteristics of pregnancy for it was in the traditional better position to consider conflicting expert evidence than are we. We differ, however, in the legal application of these and other facts to the business necessity defense.[6]

The Supreme Court has twice considered equal fringe benefit treatment of pregnant

---

**3.** See *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**4.** This defense is provided in § 703(e) of Title VII, 42 U.S.C. § 2000e–2(e) as follows:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of [their] religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

**5.** The business necessity test was first announced in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). To be successful an employer must show that the practice bears a manifest relation to the employment. 401 U.S. at 432, 91 S.Ct. at 854.

**6.** The district court concluded that there was an acceptable alternative available to Eastern by which it could equally accomplish its purpose with lesser differential impact. That is, it could set a later date for its mandatory leave requirement. That legal conclusion, however, is dependent primarily on the finding that there were bare bones mechanical procedures available to obtain written doctors' approvals for pregnant attendants monthly between the 13th and 20th week, and weekly between the 20th and 28th week. The testimony of medical experts, however, indicated only that abnormal health problems connected with pregnancy could usually be identified prior to an attendant commencing a specific flight.

That is not sufficiently specific to assist management, unions, or individual flight attendants devising safety procedures to prevent the one catastrophe that might occur while in flight. Safety procedures must be anticipated not critiqued after a catastrophic crash.

To be probative, supportive facts should have included reasonably specific percentages of flight attendants identifiable prior to flights as having health difficulties with their pregnancies; the types and nature of possible health problems identifiable; experience, if any, from industrial health experts from other industries concerning results of predicting pregnancy problems of women employees; and evidence that doctors would be willing to accept responsibility of making risk judgments concerning safety of unknown passengers rather than make "probability" judgments as to the health of patients–for medical practice and patient convenience. It is only this kind of fact–finding that is subject to the Fed.R.Civ.P. 52 "clearly erroneous standard." The ultimate conclusion that these facts demonstrate, vel non, reasonably acceptable alternatives is a conclusion of law.

women in voluntary nonworking status,[7] but has not decided a case in a Title VII context[8] involving an employer prohibiting outright a woman from working because of her pregnancy. We are presented with that question.

The enactment of section 703(a) understandably generated prolific litigation by female airline flight attendants attacking numerous employment practices in the airline industry. None have been more difficult to judicially determine than the issue created by the previously universal airlines' practice requiring mandatory pregnancy leave by female flight attendants at various stages of pregnancy. The most common airline rule has been to require maternity leave upon knowledge of pregnancy. A number of courts have decided this issue, considering basically the same quantity and quality of evidence. A number of the same medical experts have appeared in cross–sections of the decided cases. Some courts have considered virtually the same medical testimony, and have reached such contradictory results that it is impossible to reconcile them:

National Airlines could not require maternity leave during the first thirteen weeks of pregnancy, but as a bona fide occupational qualification could condition flight duty between the thirteenth and twentieth week, and could prohibit such duty after the twentieth week of pregnancy. *In re National Air Lines, Inc.*, 434 F.Supp. 249 (S.D.Fla.1977);

Pan American World Airways could, both as a "business necessity" and a bona fide occupational qualification, require maternity leave upon knowledge of pregnancy. *Harriss v. Pan American World Airways, Inc.*, 437 F.Supp. 413 (N.D.Cal. 1977) (Judge Schwazer);

Western Airlines could require leave upon knowledge of pregnancy. *Air Line Pilots Association et al. v. Western Air Lines, Inc.*, 22 E.P.D. ¶ 30,636 (N.D.Cal. 1979);

Delta Airlines could require maternity leave upon knowledge of pregnancy, as a bona fide occupational qualification. *EEOC v. Delta Air Lines, Inc.*, 441 F.Supp. 626 (S.D.Tex.1977).

Three district court opinions in this Circuit reach different factual and legal conclusions from similar medical and nonmedical evidence:

United's requirement that flight attendants stop flying upon the knowledge of pregnancy was held to be a bona fide occupational qualification permitted by section 703(e). *Condit v. United Airlines, Inc.*, 12 E.P.D. ¶ 11,195, *aff'd as not clearly erroneous, Condit v. United Airlines, Inc.*, 558 F.2d 1176 (4th Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978).

American could not require its pregnant flight attendants to take maternity leave until after the twenty–sixth week. *Maclennan v. American Airlines, Inc.*, 440 F.Supp. 466 (E.D.Va.1977);

Eastern's right to restrict flight duty was held to vary through four different periods of pregnancies, i. e., the first thirteen weeks; thirteen to twenty weeks; twenty to twenty–eight weeks; and twenty–eight weeks to termination of pregnancy. *Burwell v. Eastern Air Lines, Inc.*, 458 F.Supp. 474 (E.D.Va.1978) (the case *sub judice*).

The initial burden of Title VII plaintiffs is to show a prima facie case of employment discrimination–the burden then shifts to the defendant to prove, articulate or show a defense to the apparent discrimination. If the plaintiffs in turn, can show that the proffered employer defense is a pretext, they may still prevail. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

---

**7.** *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

**8.** *See Cleveland Board of Education v. LeFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), holding invalid under due process standards certain arbitrary mandatory maternity leave requirements for public school teachers.

Plaintiffs may, under current Title VII jurisprudence, prove a prima facie case of employment discrimination under one of two clearly defined theories: discrimination by disparate treatment or discrimination by disparate impact.

"Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . . Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. . . .

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive, we have held, is not required under a disparate impact theory. *Compare, e. g., Griggs v.*

*Duke Power Co.,* 401 U.S. 424, 430–432 [91 S.Ct. 849, 853–854, 28 L.Ed.2d 158], *with McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668]. . . . Either theory may, of course, be applied to a particular set of facts.

*Teamsters v. United States,* 431 U.S. 324, 335–36, n.15, 97 S.Ct. 1843, 1854, n.15 (1977).

Eastern's mandatory maternity leave requirements, although facially neutral, affect only one class of employees—female flight attendants—and have a disproportionate impact on their employment opportunities. This establishes a prima facie case of disparate impact employment discrimination.[9] Eastern then, at trial, had the burden of defending against the prima facie discrimination by demonstrating a legitimate justification for its policy.

The trial court, recognizing some confusion in Title VII sex discrimination cases as to whether a BFOQ defense[10] or a business necessity defense[11] applies to a disparate impact type discrimination, tested Eastern's evidence under both theories.[12] Despite the trial court's understandable dilemma, "business necessity" is the test that should have been applied.

Business necessity as a defense was first defined by the Supreme Court concomitant-

**9.** Disparate treatment and disparate impact theories may be present as alternative grounds for relief in the same case. If sufficiently supported by the evidence, either may be analyzed by the trier of fact as alternative grounds for relief. *Wright v. National Archives and Records Service,* 609 F.2d 702 (4th Cir. 1979). However, "a claimant's path after establishment of a *prima facie* case is considerably easier under the impact theory than under the treatment theory, and the same probably holds true for relative ease of proof analysis by courts." Id. at 711.

**10.** The criteria for judging a BFOQ defense was expressed in *Arritt v. Grisell,* 567 F.2d 1267 (4th Cir. 1977), an age discrimination case:

[T]he burden is on the employer to show (1) that the bfoq which it invokes is reasonably necessary to the essence of its business (here the operation of an efficient police department for the protection of the public), and (2) that the employer has reasonable cause, i. e., a factual basis for believing that all or substantially all persons within the class (in our case, persons over 35 years of age) would be unable to perform safely and efficiently the

duties of the job involved, or that it is impossible or impractical to deal with persons over the age limit on an individualized basis. *Id.* at 1271.

**11.** The criteria for establishing this defense has been no where better stated than in *Robinson v. Lorillard,* 444 F.2d 791 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), *infra.*

**12.** Considering both a business necessity and a BFOQ defense applicable in mandatory pregnancy leave cases, see *Harriss v. Pan American, supra; Burwell v. Eastern Air Lines, Inc., supra.* Many courts have considered both a business necessity and a BFOQ defense available in a disparate impact case. *See also* Schlei & Grossman, Employment Discrimination Law 1160 (1976) where, in the authors' opinion, the available defenses are a "business necessity, a bona fide occupational qualification or some other explanation which demonstrates that the substantial disparate impact is not the result of unlawful discrimination."

ly with the recognition of disparate impact discrimination. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). BFOQ was explicitly created by statute [703(e)] as a defense to the equally explicit disparate treatment discrimination of section 703(a).[13] To say, however, that the two defenses are mutually exclusive, and each confined to a separate theory of liability would be overreaching. In sex discrimination cases, however, clear disparate impact discrimination will be tested by business necessity and clear disparate treatment discrimination will be tested by a BFOQ defense. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).[14]

The task of testing the validity of Eastern's justification, therefore, is simplified since business necessity is an appropriate employer defense. It is not necessary to consider if a BFOQ defense[15] might also apply or whether it might be an appropriate defense consideration in some disparate impact discrimination cases.[16]

To successfully justify its different treatment of women flight attendants as a business necessity, Eastern must show that its challenged practice bears a manifest relation to the flight attendants' employment—that it is related to their job performance. *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. If the job-related qualification is bona fide, it may "measure the person for the job and not the person in the abstract." *Dothard,* 433 U.S. at 332, 97 S.Ct. at 2728, *citing Griggs,* 401 U.S. at 436, 91 S.Ct. at 856.

**13.** The logical equation would seem to be: a prima facie case of disparate treatment discrimination, a BFOQ defense; a prima facie case of disparate impact discrimination, a business necessity defense. There is, however, a "clinker" in this otherwise symmetrical reasoning. Congress, in § 703(a), prohibited employment discrimination based on race, color, religion, sex, or national origin. The statutory BFOQ defense, however, is pointedly restricted to religion, sex or national origin—it is not permitted as a defense to race discrimination in employment. In Title VII disparate treatment race cases the appropriate defense is usually expressed as the employer "articulating some legitimate, non–discriminatory reason" for its action. *McDonnell Douglas v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

**14.** In *Dothard* the Supreme Court considered two alleged sex discriminations by the Corrections Department, State of Alabama in the administration of its prison system. The first was by a facially neutral statute which was characterized as disparate impact discrimination, and tested by a business necessity defense. The second was specific discrimination against women, characterized as disparate treatment and a BFOQ defense applied. *Dothard v. Rawlinson, supra. See also* Schlei & Grossman, *supra* n.12, at 292.

**15.** Even if it were proper to test Eastern's practice as a BFOQ, it is doubtful that the defense would be successful since this test has an extremely narrow application. *Dothard v. Rawlinson,* 433 U.S. at 333, 97 S.Ct. at 2728.

**16.** It is possible to conceptualize employment practices producing separate factual grounds to sustain disparate impact and disparate treat-

ment discriminations or circumstances which might be confused as to which theory would apply. It would seem, in such cases, that the judicial flexibility which has evolved in Title VII cases should permit the application of either theory and, except in race cases, either defense. Although announced in a different context, the court's language in *Furnco* would indicate this direction for this area of Title VII procedure.

> This, of course, was not intended to be an inflexible rule, as the Court went on to note that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."

438 U.S. at 575 76, 98 S.Ct. at 2949 (citation omitted) (commenting on the *McDonnell Douglas* formula for establishing a prima facie case).

> The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.

438 U.S. at 577, 98 S.Ct. at 2949 (commenting on the procedural scheme for analyzing a Title VII case).

The potential for violations is so variable that the Supreme Court has simply devised new judicial tools for analyzing of Title VII cases. It is significant that although the Court throughout Title VII opinions speaks in terms of disparate treatment, disparate impact, BFOQ, business necessity, etc., that it cites the same general principles of Title VII law in all types of cases.

We measure the mandatory maternity leave policy by the criteria expressed in *Lorillard*:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.

444 F.2d at 798 (footnotes omitted).

Eastern's contention that an element of business necessity is its consideration for the safety of the pregnant flight attendant and her unborn child is not persuasive. If this personal compassion can be attributed to corporate policy it is commendable, but in the area of civil rights, personal risk decisions not affecting business operations are best left to individuals who are the targets of discrimination. Its contention that the leave policy is legitimately designed to enhance the safety of passengers meets with more success. Focusing all the evidence at trial through the criteria of *Lorillard* demonstrates that Eastern's policy as it relates to pregnancy after the thirteenth week results from the legitimate business necessity of safely transporting passengers.[17]

One—Eastern's evidence at trial was that a mandatory leave policy was necessary to the safe and efficient operation of its business. There is no evidence that it acted on contrived advice nor were its witnesses dis-credited at trial. There is nothing in the record to indicate that Eastern was not persuaded by the medical and operational information available to it. At the most, Eastern knew of opposing medical views as to the effects of the first to the twenty-eighth week of pregnancy on the ability of its flight attendants to perform in emergencies.

Medical opinion concerning characteristics of pregnancy both available to Eastern and offered at trial was clinical in part, but in large part subjective. The nonmedical operational opinions were based on scant statistics. Happily, the relatively low number of serious emergencies in the airline industry has afforded few statistics relating to the job performance of pregnant flight attendants. Doctors' opinions as to possible effects of health conditions on safety in industry are, of course, crucial. They are certainly important in this narrow field of civil rights law, and courts with some ease can judge which of the medical experts are more persuasive. Neither airlines, doctors, nor courts, however, possess the clairvoyance necessary to chart exact percentages of risk of an in-flight disaster. The ultimate chore of managing risks to passengers, nevertheless, falls to the airline, and in deference to the complexity of the task a court should not facilely substitute a judicial judgment that the resultant leave policy is unnecessary to the safe and efficient transportation of passengers.

Two—The plaintiffs do not seriously contend they should engage in flight duty after the twenty-eighth week of pregnancy. The adverse impact of the challenged leave policy on women flight attendants, then, is to deprive them of fifteen weeks of employ-

---

**17.** This case was not constricted by inadequate evidentiary procedures at trial, nor is it necessary to involve the "proof" problems of *Furnco, supra,* and *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), to determine in this business necessity setting whether an employer must "articulate" or must "prove" its defense.

Here the discrimination charges and defense were as fully presented as they could be under any order of proof. The burden of proving the defense is on the employer. The burden of persuasion ultimately falls on the plaintiffs, to show an acceptable alternate practice or that Eastern's defense was a pretext. This breaks no tradition, for the burden is no heavier than that of the traditional proponent.

The district court properly considered the factual issues under the preponderance standard, but it erred in viewing Eastern's business necessity too narrowly.

ment during a pregnancy. We do not minimize the importance of that working time to individual women who may desire and need the income which they would earn. In choosing between two critical values, however, passenger safety is sufficiently compelling to override this impact.

Three—Once it is assumed the business purpose is legitimate, there is no question but that the practice effectively carries out that purpose.

Four—There is little, if any, evidence to indicate that required maternity leaves could be determined on an individual basis in such a way as to equally accomplish the purpose with a lesser differential impact.

Tested by these standards, however, there is no credible evidence supporting Eastern's contention that pregnancy during the first thirteen weeks is a factor that might affect the safety of its passenger operation.

## III

### THE QUESTION OF PRETEXT

The plaintiffs contend that even if there is an apparent job related reason for Eastern's leave policy, it is in fact a pretext erected by the airline to camouflage its discriminatory intent. If this contention is correct, the plaintiffs would prevail despite an apparent business necessity.[18]

The trial court bifurcated Eastern's alleged pretext according to the period of pregnancy. It held the justification for mandatory leave prior to the twenty–eighth week to be a pretext, but found pretext not involved in Eastern's decision that leave after the twenty–eighth week of pregnancy was a business necessity.

The court found that Eastern had a long history of sex–based discriminatory employment practices. Other evidence of pretext was its failure to check on the health conditions of flight attendants generally, and its lack of diligence in policing the mandatory leave requirements. There is no doubt that Eastern has a long history of blatant employment discrimination based on sex. There was no attempt to camouflage, for these were standard airline practices. It is also true that the policing of health conditions largely relied on voluntary information provided by the affected flight attendant.

The long history of sex discrimination by Eastern and airlines generally certainly makes suspect the claim of business necessity for any employment practice resulting in a prima facie discrimination. We cannot say, though, that the malevolent history automatically poisons every employment practice. Although the history is a heavy evidentiary factor, each practice must be judged as to its purpose, and each *Albemarle* alternative practice advanced by plaintiffs must be gauged in light of this avowed purpose.

---

18. The concept of pretext as a part of the plaintiff's proof was first recognized in *McDonnell Douglas, supra*, a disparate treatment case. In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), a disparate impact case, the Supreme Court characterized this rebuttal phase of a plaintiff's case by stating: "[I]t remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Id.* at 425. (The Court went on to state that such a showing would be evidence of employer "pretext.") Since this is essentially equivalent to one element of the *Lorillard* business necessity test, it might appear that the scheme of proof implicit in *Lorillard, supra*, absorbs the "pretext" function in disparate impact/business necessity cases. Subjective motivation of the employer plays no role in determining whether "business necessity" is a legitimate defense. It would seem, since "pretext" is subjective in nature, it would not be part of the scheme of proof in disparate impact cases. The Supreme Court, however, appeared to use it in that context in *Albemarle*. I would not approve or disapprove its use here. The legitimacy of Eastern's "business necessity" must be decided from objective facts. If a district court, however, wishes to view the fact from different perspectives, it should not be inhibited by semantic obstacles from using any tool that might be helpful in resolving these difficult legal/factual questions. In light of the *Furnco*-announced elasticity of analysis, a trial court should not be formalistically precluded from utilizing pretext even in disparate impact cases if viewing the employer's actions from that perspective contributes to the objective understanding of whether the practice is necessary.

The courts in the civil rights area tread the hard-drawn line between preventing the abuse of individuals and interfering in legitimate business intercourse. If employers do not meet the humane standards of Title VII in their relations with employees, the courts, if necessary, will order corrective action, but there are limits to such judicial relief. As stated in *Furnco*: "Courts are generally less competent than employers to reconstruct business practices, and unless mandated to do so by Congress they should not attempt it." *Furnco*, 438 U.S. at 578, 98 S.Ct. at 2950. The *Furnco* admonition applies both to determining if there was a business necessity for the leave policy and whether there was pretext in establishing it.

Simply stated, the necessity for limiting the flight duty of pregnant attendants was part of Eastern's program to maximize the safety of its passengers. Safety practices of this nature are not designed to govern a certain disaster. Risk management involves the elimination of potential impediments to safety before they materialize into unfortunate realities. To require safety management to predict with exactness human factors involved in such a variable emotional and physical experience as pregnancy is to require the impossible. Pretext might easily be found if a newspaper, a public school system, or a law firm discriminatorily chooses a course of action resulting in the prevention of women employees working during any phase of pregnancy, but an industry with a primary function of managing the safety of large numbers of passengers must be allowed more latitude. It legitimately is required to scrutinize more closely the ability of a woman to perform during different stages of pregnancy. Her safety properly, should be left for her consideration, but if the physical or emotional aspects of pregnancy could affect the performance of a primary business objective, it is properly for the employer to consider. It is emphasized that the correctness of Eastern's "business necessity" termination is not judged by its subjective motivation. "Business necessity" as a defense succeeds or fails on objective necessity based on facts available to it at the time it designed the controverted policy.

Despite computerized resolution of the logistics of mass transportation, there remain to simple business judgment many choices which can not be computerized. Subjective good faith is not enough to justify sex discrimination as a business necessity, yet in objectively weighing the necessity against the *Lorillard* standards, the test is not whether each underlying assumption is ultimately proved to be correct. The *Lorillard* tests are satisfied if all information available to the employer reasonably requires the challenged personnel practice in order to achieve an overriding business purpose. The employer's actions must be contemporaneously judged—not tested by hypotheses that are not provable or which would require unreasonable experimentation with its business in order to prove the validity of its decision. These considerations lead us to the belief that Eastern legitimately established the disputed leave policy as a business necessity.

Accordingly, this case is affirmed in part and reversed in part and remanded to the district court for action consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED.*

BUTZNER, Circuit Judge, with whom WINTER, HALL, and PHILLIPS, Circuit Judges, join, concurring in part and dissenting:

I concur in affirming the district court's judgment that Eastern could not require pregnant stewardesses to forfeit their seniority rights upon temporary transfer to ground work. Furthermore, I agree with the conclusions reached in Part II of Judge Sprouse's opinion that Eastern cannot impose its mandatory leave policy during the first trimester of pregnancy and that it can impose this policy after the 28th week of pregnancy. I also agree that Eastern has not justified its maternity leave policy on the ground that it promotes the safety of its pregnant stewardesses and their unborn children.

The district court ruled that Eastern must evaluate on an individual basis the ability of each stewardess to perform her duties between the 13th and 28th weeks of her pregnancy. I dissent from the reversal of this aspect of the district court's judgment. It is founded on the correct application of Title VII of the Civil Rights Act of 1964 to facts that are amply supported by the record.

I

As Judge Sprouse's opinion lucidly demonstrates, Eastern's mandatory pregnancy leave policy has a disparate impact on the stewardesses as a class. Therefore, it can be sanctioned only if it is "necessary to the safe and efficient operation of the business." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.1971). Voicing a rational justification for the policy is not enough. When, as here, a complainant has established a prima facie case of discrimination by showing that an employment policy has a disparate impact on the protected class, and the employer has shown that its policy is job related, a court's analysis must proceed to what I consider the critical issue in this case. This is the question of suitable alternatives to the challenged policy. The Supreme Court has aptly phrased this issue for us: "[I]t remains open to the complaining party to show that other tests or selection devices without a similarly undesirable racial [or sex–based] effect would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Judge Sobeloff reached the same conclusion in *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.1971), where, speaking of the business necessity defense, he said, "[T]here must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial [or sex–based] impact." If such alternatives exist, it cannot be said that the employer's business practice, though job related, is necessary. 444 F.2d at 798 n.7.

The district court adhered to these precepts. It recognized that Eastern's policy was job related, but it found from the evidence that alternative measures would serve Eastern's legitimate interests. In Part II, I will attempt to demonstrate within the brief confines of a dissenting opinion that, although the evidence conflicted, the district court's findings of fact are amply supported by the record. But first, one other aspect of the law deserves comment.

Acceptance of Eastern's policy cannot be predicated on the company officials' assertion of a bona fide belief that it is justified. The principles that govern discriminatory impact cases and the business necessity defense are explained in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). There, speaking of an employer's lack of discriminatory intent, the Court said, 401 U.S. at 432, 91 S.Ct. at 854:

> But Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.

*Griggs* persuades me to reject Eastern's thesis that its bona fide belief in the utility of its mandatory pregnancy policy should determine the outcome of this case. The company's reliance on *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), does not compel a different conclusion. *Furnco* dealt with a type of discrimination that has been described as disparate treatment. In such cases the complainant must prove discriminatory motive. In contrast, a complainant need not prove discriminatory motive in a case that discloses discriminatory impact. *See generally Teamsters v. United States*, 431 U.S. 324, 335–36, n. 15, 97 S.Ct. 1843, 1854 n. 15 (1977).

II

The district court, of course, is the appropriate and best judge of the evidence. We

may reject its findings only for clear error. Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948).[1] Expert witnesses presented conflicting views about the effects of pregnancy on a stewardess's ability to do her job. The district court resolved these conflicts and found from the evidence that alternative measures, short of grounding all pregnant stewardesses, could reconcile Eastern's legitimate interests with the Act's prohibition of sex–based discrimination.

The most comprehensive empirical evidence in the record about the routine operation of an airline that does not have a mandatory pregnancy leave policy fully sustains the district court. Northwest Airline stewardesses continue to work until the 28th week of pregnancy if physicians certify to their abilities.[2] Northwest's policy recognizes, as did the district judge, that pregnant stewardesses can and should be evaluated on an individual basis. Northwest adopted this policy after consulting with medical experts of the Division of Obstetrics and Medical Gynecology at the Mayo Clinic. These experts concluded that pregnancy did not affect all stewardesses' abilities until late in gestation. Northwest's medical advisor, a diplomat in Aviation Medicine and a former president of the Aerospace Medical Association, testified that Northwest had experienced no operating difficulties during the two years that this policy had been in force, although many women had been flying while pregnant.

A recognized expert in gynecology and obstetrics, who had done considerable work on the effects of high altitude on fetal development, testified that the increasing weight gain and girth that accompany pregnancy are the principal incapacitating factors for work as a stewardess. He discounted the significance of most of the typical complications of pregnancy, such as fatigue, morning sickness, fainting, varicose veins, and clumsiness. He stated that the average stewardess would retain her abilities unchanged through the 20th week of pregnancy, and that, for 20 to 28 weeks, ability would depend on the individual. He believed that, although it is impossible to predict beforehand which pregnancy would produce disabling complications, such complications usually can be diagnosed during the course of pregnancy before disability. He also asserted that pregnant stewardesses before 28 weeks are at no greater risk of trauma than non–pregnant stewardesses. He considered the risk of miscarriage, which he admitted could be disabling, no greater than the risk of a male steward's suffering from appendicitis or a heart attack while in flight.

The stewardesses' other medical witness, an author of a major treatise on obstetrics who also qualified as an expert in gynecology and hematology, testified that he believed pregnant stewardesses should and could be evaluated on an individual basis. He stated that pregnancy generally produces no appreciable change in strength or in the ability to perform physical work before the 28th week. He also testified that trauma severe enough to disable a pregnant stewardess would likely incapacitate a non–pregnant stewardess.

Although Eastern's medical experts were firm in their opinion that pregnant stewardesses should not be permitted to fly, their testimony, fairly read, reveals that they, too, recognized that pregnancy's effects differ from individual to individual. They acknowledged that some pregnant women could possess the capacity to perform all routine and emergency tasks required of a stewardess. On cross–examination, Eastern's principal expert witness said that he permits his pregnant patients, depending on their individual capacities and experience, to continue to work, ride horses, ski, and water ski. Another airline witness

1. This familiar principle of appellate review dictated affirmance of the district court in *Condit v. United Air Lines*, 558 F.2d 1176 (4th Cir. 1977).

2. Eastern's interim policy, discussed *infra* at pp. 376–377 adopts essentially the same procedures.

testified that he allows his pregnant patients at 20 weeks to play tennis, and that from his observation a stewardess's duties were not more exhausting than tennis.

All of the experts agreed that miscarriage, which occurs unpredictably in about ten percent of all pregnancies and for which no effective treatment exists, could incapacitate a stewardess if it happened during a flight. The experts also agreed, however, that miscarriages are preceded by obvious and recognizable symptoms that would permit, in the vast majority of cases, a stewardess to remove herself from a flight sequence. Also, the testimony disclosed that 90 percent of all miscarriages occur within the first 12 weeks, a period, as the district court noted, during which Eastern's stewardesses have been flying routinely.

The record establishes that Eastern's mandatory leave rule evolved from policies that were inherently discriminatory in their treatment of women. From the late 1950's until 1972, Eastern hired only single women as flight attendants; during this period males were excluded. Until the mid–1960's, Eastern fired any woman who married. Up to 1965, Eastern also fired any woman who became pregnant. It retained this option until 1970, at which time without conducting any study to determine whether pregnancy impairs stewardesses' ability to work, it adopted the rule requiring stewardesses to take unpaid leave when they became pregnant. Although aware that other airlines safely operated with less restrictive policies, Eastern has made no effort to administer its policy on an individual basis.

There is no dispute that Eastern's rules dealing with pregnancy differ from its regulations for other physical conditions. Apart from its pregnancy policy, the airline has no written guidelines governing fitness of its flight attendants; nor does it routinely examine them. Eastern's medical director testified that the airline's normal method of handling physical and mental disabilities, other than pregnancy, is to rely

upon self–monitoring. If a stewardess, who is not pregnant, fails to remove herself from a flight when she is incapable of performing, the airline expects complaints from fellow workers or passengers to reach the medical department, which investigates each individual case as necessary. Eastern permits stewardesses with controlled diabetes and controlled epilepsy to fly under supervision of the medical department, even though medical experts testified that these conditions are more likely to be disabling than pregnancy. The district court found, and Eastern does not dispute, that maternity is the only disability for which Eastern requires stewardesses to take leave without pay.

The district court noted that Eastern's enforcement of its own policy is remarkably lax. A number of stewardesses testified to having worked while pregnant without experiencing difficulties. Eastern's only methods of ensuring compliance are voluntary reporting and visual detection. As a result and as Eastern is aware, stewardesses commonly fly through the 12th and 20th weeks of pregnancy. Eastern recounted incidents of stewardesses removing themselves from flight sequences because of pregnancy–related disabilities; on these occasions the stewardesses followed the practice approved for other sicknesses or disabilities. Eastern did not produce, however, any evidence that its lax administration of its rule creates any risk to its passengers.

While this case was pending on appeal, Eastern altered its leave policy to comply with New York law.[3] The new regulations, which Eastern terms "interim," allow a stewardess to continue working while pregnant as long as her doctor or Eastern's medical department certifies her capability. The new policy affords a stewardess sick leave benefits only after a doctor certifies that she is unable to continue working. Before that time a pregnant stewardess, if she desires not to work, must take unpaid leave. The adoption of this rule further supports

---

**3.** Without objection from the appellees, Eastern supplemented the record by filing a copy of *its current regulations.*

the district court's conclusion that the mandatory ban of all pregnant stewardesses was not a business necessity. The new policy demonstrates that individual evaluation is a suitable alternative that does not sacrifice airline safety.[4]

The district court's judgment requiring Eastern to modify its mandatory pregnancy leave policy by evaluating stewardesses on an individual basis is amply supported by the record, and it conforms precisely to the principles explained in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), and *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir. 1971). The district court, however, did not have an opportunity to consider Eastern's new policy. Therefore, I would remand this case with directions to the district court to consider the propriety of amending its decree in the light of the regulations that Eastern has now adopted.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

■ With respect to the special provision causing a pregnant employee to lose seniority accrued as a flight attendant in the event of transfer to a position not directly related to flight attendant work, I am in complete agreement with the majority. Sickness and injury are exceptions but pregnancy is not. I fail to perceive any justifiable reason for according pregnant employees, necessarily all female, less favorable seniority treatment than that accorded any other employee who is obliged for reasons of physical condition temporarily to cease flight service. *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977).

■ However, I do not agree entirely with the disposition which the majority has decided is appropriate with respect to a rule which Eastern Airlines, Inc. had adopted requiring that, immediately upon pregnan-

cy, an employee without exception became ineligible for flight service and, absent a transfer to other employment, had to enter unpaid maternity leave status until after termination of the pregnancy by birth of a child or otherwise and the return of the employee following recovery from any attendant incapacity. The district court did acknowledge a limited validity for the rule but restricted its application to the third trimester (i. e., after the twenty–eighth week). The majority would permit enforcement of the rule during the second and third trimesters, but not the first (i. e., not during the first thirteen weeks). I respectfully submit that reasons indicating a substantial growth in the safety risks, even in the first thirteen weeks, suffice to allow enforcement of the rule as promulgated by Eastern.

Title VII has generated enough litigation that cases under it have achieved a language, if not altogether a life, of their own. Predominantly concerned with race and sex, they first command an inquiry into whether there has been, at least *prima facie*, discrimination. Apart from blatant examples, which would require little in the way of a special lexicography, the cases have generally spoken in terms of disparate treatment and disparate impact as conditions which, when established, demonstrate the existence *prima facie* of discrimination.

The cases, for these initial purposes, break down into at least two very distinct categories, one of which has little or no pertinence to our present inquiry. In all the cases where discrimination is asserted, there is a palpable difference between the favored and the disfavored individuals or groups of employees or prospective employees. Without one, indeed, it would be difficult if not impossible to identify race or sex, standing alone, even as a possible, let alone a probable cause for difference in treatment to the disadvantage of the minority group member or the woman. A black is

---

4. Eastern's explanation of its new policy discloses that United, which prevailed in *Condit v. United Air Lines*, 558 F.2d 1176 (4th Cir. 1977), has revised its rule to conform to New York law. *See United Air Lines, Inc. v. State Human*

*Rights Appeal Board*, 61 App.Div.2d 1010, 402 N.Y.S.2d 630 (2d Dept.), *appeal denied*, 44 N.Y.2d 648, 407 N.Y.S.2d 1027, 379 N.E.2d 596, *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).

distinguishable from a white, a man from a woman, through simple observation.

The heart of anti–discrimination can be summed up by the observation that while there *is* a difference it does not, and, but for exceptional circumstances, may not *make* a difference. The mere fact of skin hue, or physical configuration, is essentially irrelevant to how well a job can be performed and so normally may not be taken into account. Employers have on occasion, where the differentiations on grounds of color or of sex admittedly do not, of themselves, allow different treatment, shifted ground to something less immutable than skin color or other permanent physical differentiating characteristics and introduced standardized testing, avowing that the purpose is solely to secure better qualified employees, regardless of race or sex. The test may suffice to provide an acceptable basis for hiring practices, although statistically a minority or women do less well on the tests, if the tests are "job–related"; if they bear a "manifest relationship to the employment in question." *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587 & n.31, 99 S.Ct. 1355, 1366 & n.31, 59 L.Ed.2d 587 (1979); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Those are cases,[1] however, involving a total ban on the differentiating and immutable race and sex characteristics to justify less favored treatment to a minority or female individual or group, since they bore, in the posture of the cases as they arose, in no way on qualifications to perform the work. Instead, attempted justifications for treating the plaintiff or plaintiffs less well related only to supposed acculturation aspects of the job applicant which were not unchangeable and which could be improved to his or her benefit. Our present case is very different in that an immutable differentiating characteristic is the aspect of things on which difference in treatment is based, and is a condition which cannot be altered to the individual's benefit with the passage of time. On the contrary, as time goes on, pregnancy can only continue to increase the reasonableness of the differentiating treatment based on sex itself, until, by the third trimester, at the latest, all participants in the controversy agree that it is proper to treat pregnant women differently than men (and non–pregnant female flight attendants).[2]

Hence, to solve the questions presently before us, we should direct our attention to other cases, in which the physical idiosyncracies associated with a particular race or a particular sex are the very basis for the differentiating treatment.

Our first question, of course, is whether the sex or racial identifying characteristic can *ever*, in and of itself, be a justifiable, non–discriminatory grounds for according non–identity of treatment. The two cases in which the Supreme Court has addressed the question both have answered in the affirmative. *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977).[3]

In *Gilbert*, the employer had a sick leave pay arrangement extending to virtually all kinds of sickness. On the grounds it was not an illness, General Electric did not pay employees who had to go on leave because of pregnancy. In determining whether it constituted discrimination not to pay its

---

1. As is also *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

2. Since the result achieved by the majority agrees that such differentiating treatment is also proper for the second trimester, all that may be said about the third trimester would apply with equal force and effect to the second. The scope of my disagreement with the majority is, thus, restricted to the first thirteen weeks of pregnancy.

3. *Satty*, even as in the present case, involved two different employer programs which were under attack: (1) loss of seniority upon pregnancy, and (2) denial of sick leave pay to pregnant employees. The finding of impermissible discrimination, insofar as loss of seniority was concerned, has already been cited and relied on at the outset of this opinion. With respect to the denial of sick leave pay, the Court adhered to *Gilbert's* conclusion.

pregnant female employees the sick leave allowance, the Supreme Court was faced with a quandary of some dimensions. The women could and did argue that, because of the exclusion, men got the benefit in all cases, whereas the women got the benefit for only some, not all of the cases. Yet, if the employer had chosen to pay the benefits to women disabled by pregnancy, the men could have contended with equal logical force, that both categories got only the benefits for heart, liver and other ailments to which both sexes were subject, but women alone also got, while men did not, important and substantial economic benefits associated with pregnancy, and so associated with women only.[4]

The fact was that there was no way to treat the two categories identically. Up to now, and presumably forever, men cannot become pregnant. So different treatment will inevitably result either way. It is hardly surprising that, faced with a "damned if you do and damned if you don't" situation, the Court concluded that, since the amount paid in women's benefits equalled or exceeded the benefits paid for men, even without including pregnancy as an event giving rise to eligibility for payment, there was no discrimination.

Likewise, in *Satty*, the Court determined that a denial of benefits to women for pregnancy was facially neutral, so did not create a *prima facie* case of discrimination.[5] Nevertheless, as the Court was careful to point out, if the employees could meet the additional burden of proving pretext, i. e., that the employer really intended to discriminate, and only used the facial neutrality as an excuse, a right to relief would be made out.

So, as in *Gilbert* and in *Satty*, we must first determine whether pregnancy makes a difference justifying different treatment in the circumstances of the present case or whether pregnancy *is* only a difference without *making* one.

Here we must, except to the extent of the consequences of a conclusion that *prima facie* discrimination was not made out, take our leave of *Gilbert* and *Satty*, for the factual materials from this point on have so little similarity as to be of no real assistance in determining whether the facts of the instant case do or do not make out *prima facie* discrimination. Dealing, as *Gilbert* and *Satty* did, with whether leave associated with pregnancy must be compensable to avoid a charge of discrimination is quite different from deciding whether a requirement that a flight attendant immediately stop flying and take leave without pay until termination of and recovery from any after effects of the pregnancy is discriminatory.

In the first place, there is the added factor of involvement of others than merely the employer and the employee, who alone were concerned in *Gilbert* and *Satty*. Outside third parties, namely the passengers,[6] have an interest which cannot be ignored.

Second, pregnancy in *Gilbert* and *Satty* was not fragmented into trimesters. No doubt the impact on the issues there before the Court was greatest in the third trimester. Nevertheless, the relevance of the decisions as to whether or not there was discrimination on a *prima facie* basis in the present case is remote. The relevant test is a different one, as to which an answer must be found without the assistance of decisive or even strongly indicative precedent from the Supreme Court. It is simply whether

---

**4.** While the argument has less emotional appeal at a time when overcoming past discrimination against women is in the forefront of the minds of most of us, it, nevertheless, as a matter of pure logic has as much or as little validity as the argument advanced by the female employees.

**5.** "When confronted by a facially neutral plan, whose only fault is underinclusiveness, *the burden is on the plaintiff* to show that the plan

discriminates on the basis of sex in violation of Title VII." (emphasis supplied). 434 U.S. at 144, 98 S.Ct. at 352.

**6.** The flight crewmembers also are third parties directly involved. While an argument could be constructed that their interests are bound up in those of the employer, it is really a personal concern of crewmembers, the enhancement of their individual safety, which is engaged.

". . . the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest . . ."[7] combined with the generally accepted medical evidence spells out a situation in which danger in flight service is significantly enlarged unless disqualification occurs immediately upon the first knowledge of pregnancy. If not, discrimination has been made out. If, on the other hand, a manifest increase in safety risk is demonstrated discrimination is convincingly rebutted. A secondary question arises, if the manifest increase in safety risk is demonstrated, whether the plaintiffs never succeeded in finally establishing *prima facie* discrimination as part of the plaintiffs' case, or whether, although *prima facie* discrimination was made out, nevertheless, as an affirmative defense, a showing of business necessity or *bona fide* occupational qualification by the defendant overcame the *prima facie* case.

The nature of airplane accidents is such that they are, fortunately, extremely infrequent for the scheduled airlines and, on the other side of the coin, usually so devastating when they do occur that death of everyone is so inevitable and virtually immediate that the physical condition of the flight attendant is not going to matter one way or the other. Nevertheless, there are intermediate situations on which quick and alert reaction by flight attendants · in circumstances of great danger and tension may make all the difference. The medical evidence supports a conclusion that a pregnant flight attendant may be somewhat less able to respond in a complete and efficacious manner. The testimony unequivocally establishes that, although, if healthy, a flight attendant during the first thirteen weeks could perform as effectively as though she

were not pregnant, a substantial disability could occur in the event of a miscarriage. Miscarriage is defined as the termination of pregnancy before the twentieth week. Miscarriage is an illness confined to pregnancy, and its occurrence in the first thirteen weeks is frequent enough[8] that the airline here was justified in giving the attention it gave to the increased risk, and in removing pregnant flight attendants from service immediately on learning of the pregnancy.

The airline charged with the safety of its passengers and crew should be entitled to take the change in the risk factor into account by doing what it reasonably can to preclude any palpable growth in the risk. It should be enough in the way of justification to point to a humanitarian responsibility. However, were it not, there remains the increase in the possibility of huge claims for injury and death occurring because a pregnant flight attendant, even during the first thirteen weeks, was serving the passengers and was handicapped or incapacitated in a crucial manner at a crucial time.

Having so determined, we have, just as the Supreme Court in *General Electric Co. v. Gilbert* had, a situation where, the facts having been considered, an exclusion based on pregnancy was "not a gender–based discrimination at all." *Id.* 429 U.S. at 136, 97 S.Ct. at 408.[9] In sum and substance, the gender variation, while it only *is* a difference prior to pregnancy, *made* a difference once pregnancy had occurred and the disqualification from flying proceeded, not from sex, but from disability.

That, of course, does not end the matter, for the possibility of pretext still remains. While *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), has held that the denial of sick pay for pregnancy, although facially neutral, may

---

7. 49 U.S.C. § 1421(b).

8. The overwhelming majority occur in the first thirteen weeks. Approximately 10% of all implanted pregnancies will terminate in miscarriages. Ninety percent of these will occur in the first thirteen weeks. There is no indication that incapacitating miscarriages can be predicted in such a way as to confine grounding of flight attendants to only some and not all who

are pregnant. The dangers of miscarriage are real in every pregnancy. Miscarriages beyond the sixth week of pregnancy are usually disabling.

9. Elsewhere the Court said "the respondents have not made out the requisite showing of gender–based effect[s]." *Id.* at 137, 97 S.Ct. at 409.

nevertheless be found discriminatory upon proof of pretext on the part of the employer, it is by no means clear that *Satty*, concerned only with the interests of employer and employee, would extend to a situation involving responsibility to third parties such as other flight crewmembers and passengers. Assuming that it does, nevertheless, the posture of this case effectively repudiates the existence of pretext. This is so because 90% of Eastern's flight attendants are female, reflecting a strong past practice favoring (men flight attendants could well argue "discriminatorily favoring") women for that position. The physical appearance of flight attendants is not significantly affected during the first thirteen weeks of pregnancy. Thereafter, a majority of the Court is prepared to hold that the airline would not be acting discriminatorily if it discontinued flight service during the continuation of pregnancy in the second and third trimesters.

The airline must go to expense to identify and train flight attendants. It is not lightly to be supposed that it goes to that expense in an employment area which heavily favors females, only, for no valid reason, to force them off flight duty during the first thirteen weeks. During those thirteen weeks, when pregnancy is not visually evident, knowing that from the thirteenth week on the airline might properly disqualify them for flight service during the pendency of the pregnancy, it strains credulity beyond the reasonable point to hold that it is to be conjectured, assumed or concluded, in the absence of direct evidence, that those responsible for the decisionmaking of the airline were in fact acting pretextually and discriminating on the grounds of a difference uniquely sex–related. No respectable reason has been advanced to find a pretext in a policy which will complicate personnel problems for the airlines, in a position for which it has traditionally preferred females,

whose physical appearance will not be altered, and whose removal from flight service after thirteen weeks is clearly proper and not discriminatory. It would be too farfetched in the face of such considerations to allow an argument of pretext distilled from other, evidently distinguishable cases without such overwhelming countervailing considerations. This is not to say that as an airline executive I should have reached the same conclusion. The careful and detailed opinion of the district judge outlines substantial basis for a belief to the contrary. But it is not incumbent on the airline official to be wise—only that he or she be non–discriminatory.

With respect to that aspect of the decision, I consequently would reverse the decision of the district judge. I find no sufficient basis for a finding of discrimination in the first instance or secondarily on the basis of pretext.[10] In this connection, I would point out one advantage of my conclusion. It insures the same result whichever airline and whichever district judges are involved, assuming no other indicators of sexual discrimination are present. It, therefore, avoids the undesirable result which I fear the majority decision will bring about of differing results depending on factfindings in individual cases where the issue really is essentially the same throughout the industry. Cases favoring Eastern by deciding that the immediate unpaid leave requirement effective upon the first knowledge of pregnancy was valid are:

1. *Harriss v. Pan American World Airways*, 437 F.Supp. 413 (N.D.Cal.1977);

2. *EEOC v. Delta Air Lines, Inc.*, 441 F.Supp. 626 (S.D.Tex.1977), *reversed and remanded on purely procedural grounds*, 619 F.2d 81 (5th Cir. 1980);

3. *Air Line Pilots Ass'n v. Western Air Lines, Inc.*, 22 E.P.D. ¶ 30,636 (N.D. Cal.1979);

10. It should be emphasized that there is no occasion, on the facts of the case, to explore whether we have a situation where *prima facie* discrimination was not, in the end, made out or whether the defendant successfully met the burden of rebutting on the grounds of business necessity or *bona fide* occupational qualifica-

tion a *prima facie* case established by the plaintiffs. The facts on which I rely to demonstrate a safety problem of significant proportions, which cannot be confined in advance to only some of the cases of pregnancy are not in dispute.

4. *Condit v. United Airlines, Inc.,* 12 E.P.D. ¶ 11,195 (E.D.Va.1975), *affirmed as not clearly erroneous,* 558 F.2d 1176, (4th Cir. 1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978). Cases going the other way are:

1. *MacLennan v. American Airlines, Inc.,* 440 F.Supp. 466 (E.D.Va.1977);

2. *In re National Airlines, Inc.,* 434 F.Supp. 249 (S.D.Fla.1977);

3. The case under current consideration, *Burwell v. Eastern Airlines, Inc.,* 458 F.Supp. 474 (E.D.Va.1978).

Nor is the argument persuasive that the rule requiring discontinuation of flight service even in the first thirteen weeks because of pregnancy should be deemed discriminatory because of widespread failure of flight attendants to honor the rule. The argument runs that the rule unfairly discriminates against the forthright and honest, in favor of the dissimulative and dishonest employees who violate a company rule and conceal existence of pregnancy. The short answer is that Title VII does not exist to create protected rights in dishonest employees. Absent a showing that Eastern connived in or winked at the failure to report, and none is shown to have existed in this case,[11] that should not be a ground for invalidating an otherwise reasonable rule.

In short, it was a facially neutral treatment of a difference between men and women created by another force than human beings, and apparently immutable, which has an adverse impact on flight safety. There is no justification for pursuing a pretext claim, wholly rebutted by other evidence in the case. To the extent of the holding that mandatory discontinuation of flight service is discriminatory when enforced in the first trimester I would reverse.

Circuit Judges DONALD RUSSELL and WIDENER have authorized me to say that they concur in my dissent.

WIDENER, Circuit Judge, concurring and dissenting:

■■■■ Although I concur completely in Judge Murnaghan's separate opinion, a few additional words are, with respect, in order in light of what the majority finds, or fails to find, in the record regarding the effect of pregnancy during the first thirteen weeks.

The majority's treatment of the first thirteen weeks of pregnancy (Part II of Judge Sprouse's opinion) is based on the similar premises that the experts "point to the virtual unanimous conclusion that a pregnant flight attendant can adequately perform routine and emergency duties through the thirteenth week of pregnancy," p. 366, and that "there is no credible evidence supporting Eastern's contention that pregnancy during the first thirteen weeks is a factor that might affect the safety of its passenger operation." P. 372. I believe both of them are demonstrably unsupported by the record.

. Even a hurried reference to the appendix shows an unrefuted example of an actual occurrence which supports my view. On an Eastern flight from Boston to Washington with a stop at Lexington, one stewardess had to work the trip by herself because the other stewardess, in her first trimester, was incapacitated by morning sickness. If the Captain had known about it, he would have had to cancel the trip in order to comply with FAA requirements. FAA requirements were violated by flying the trip with only one stewardess able to perform her duties. (App. 1272, 1282).

An equally obvious example is the testimony of Dr. William Cooper whose specialty is obstetrics and gynecology. Dr. Cooper has been a practicing physician since 1953 and is a licensed pilot. He has delivered somewhere between 7,000 and 10,000 babies and has seen many more patients than that.

---

11. Nothing suggests that Eastern ignored knowledge of pregnancy and permitted the pregnant flight attendant to continue to fly. At most the plaintiffs develop from their evidence that Eastern could more effectively have ferreted out pregnant flight attendants. But that is well short of knowing disregard of the rule, which would support a finding of pretext. At most, carelessness has been made out, and that does not amount to bad faith or evil motive.

Dr. Cooper testified in small part as follows:

"Q. Can women ordinarily predict when they will be affected by morning sickness?

A. No. I don't believe they can predict it at all, Ms. Perdue. It can happen at any time. Come out of the blue just like that; no warning.

Sometimes they will even notice a projectile vomiting and difficulty getting to the bathroom in order to not mess things up.

It is not predictable.

Q. Are dizziness and fainting sometimes common the first trimester?

A. Very common."

(App. 1134)

\* \* \* \* \* \*

Q. Is it possible to predict when a pregnant woman will faint or which women will suffer from this?

A. It is not possible to predict which women will suffer from it.

It is possible, otherwise, to say, stay out of a closed–in environment, a hot environment; stay out of a situation where this might occur.

And when you have finished eating dinner, stand up slowly; don't get out of bed rapidly in the morning, and so forth.

Q. In your opinion, would this tendency to faint or dizziness be aggravated by motion?

A. Yes, I think it would.

Once again, the body has to adjust to another irritant or something occurring to the body's environment.

(App. 1136)

\* \* \* \* \* \*

Q. Do you believe it [permitting pregnant flight attendants to work on aircraft] would compromise the safety of passengers and other crew members on the aircraft?

A. I do.

(App. 1175)

The nine physicians who comprised the Air Transport Association Medical and Sanitation Committee recommended by a 8 to 1 vote that flight attendants should be taken off flight status as soon as they are aware of pregnancy. (App. 1266)

The above uncontradicted incident, the brief excerpt from the testimony of Dr. Cooper, and the unrefuted recommendation of eight of the nine physicians comprising the Air Transport Association Medical and Sanitation Committee show, I submit, beyond doubt that the position of the majority that there is a "virtual unanimous conclusion that a pregnant flight attendant can adequately perform routine and emergency duties through the thirteenth week of pregnancy," and its similar position that "there is no credible evidence supporting Eastern's contention that pregnancy during the first thirteen weeks is a factor that might affect the safety of its passenger operation" are not supported by the record.

To simply dismiss as incredible the evidence of the physician who testified contrary to the findings of the majority is not a sufficient answer. I suggest that it may be explained by the fact that neither the opinion of the district court nor either of our opinions (Judge Sprouse and Judge Butzner) which make up a majority permitting pregnant stewardesses to fly during the first thirteen weeks, even mentions the statutory standard which is deeply involved in this case, which is, of course, 49 U.S.C. § 1421(b). That statute requires in terms that the FAA administrator shall give full consideration to "the duty resting upon air carriers to perform their service with the highest possible degree of safety."

A stewardess who is vomiting in the lavatory cannot participate effectively in an emergency evacuation. Neither can one who is fainting or miscarrying. If for no other reason than because the record will support only the conclusion that fainting and vomiting cannot be predicted, it is simply not possible to operate an aircraft with the "highest possible degree of safety" with a stewardess flying who may well be incapacitated just when she is needed most. I suggest that the absence of any mention of the statutory requirement in the opinion of

the district court and the two majority opinions of this court is due to the fact that there is no answer to it. But the question must be answered before liability may be established. A finding of liability with no answer given, or even attempted, to what is obviously one of the key questions in the case, is, I submit, unjustified.